UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

FLORENCE DIVISION


United States of America,      )
                               )
          vs.                  ) 4:21cr00183
                               )
Nicholas Languerand,           )
                               )
          Defendant.           ) April 20, 2021


TRANSCRIPT OF PRELIMINARY AND DETENTION HEARING

BEFORE THE HONORABLE THOMAS E. ROGERS, III
United States Magistrate Judge, presiding


A P P E A R A N C E S:

For Plaintiff:              Elliott B. Daniels, Esquire
                           US Attorneys Office
                           1441 Main Street, Suite 500
                           Columbia, SC 29201


For Defendant:             Michael A. Meetze, Esquire
                           Federal Public Defender's Office
                           401 West Evans Street, Suite 105
                           Florence, SC 29501



Recorded by Leah S. Gibbons
Transcribed by Teresa B. Johnson, CVR-M-CM, RVR, RVR-M
U.S. District Court Reporter
300 E. Washington Street, Room 304
Greenville, S.C. 29601


Proceeding recorded by electronic sound recording, transcript
produced by transcription service.

**P R O C E E D I N G S**

(Court is called to order on Tuesday, the 20th day of April 2021, at 3:00 p.m.)

**THE COURT:** All right.

Mr. Languerand is with us now by video teleconference.

Mr. Daniels, you want to call this case please?

**MR. DANIELS:** Yes, Your Honor.

May it please the Court. The next case on the docket is United States versus Nicholas Languerand bearing Criminal No. 4:21-183, Your Honor. We are here for a preliminary hearing and a detention hearing. As Your Honor knows, Mr. Languerand was arrested late last week on a criminal complaint out of the district of the District of Columbia. The government moved for detention. The defendant asked for a preliminary hearing and a detention hearing. We're here today for those hearings.

For the record, the defendant is present by video. His counsel is in the courtroom. The government is prepared to go forward.

**THE COURT:** Okay.

All right.

And Mr. Meetze, are -- you represent Mr. Languerand?

**MR. MEETZE:** I do, Your Honor.

**THE COURT:** All right.

Are y'all ready to go forward?

1          **MR. MEETZE:**  We are.

2          **THE COURT:**  Have both sides received a copy of the

3    pretrial services report?

4          **MR. DANIELS:**  The government has, Your Honor.

5          **THE COURT:**  Any objection from the government to the

6    information contained in the report?

7          **MR. DANIELS:**  Your Honor, my understanding is that he

8    had one additional criminal charge. It's something we talked to

9    probation about. It was for an assault by the Vermont State

10   Police. But admittedly, speaking with probation, I think we

11   were having some difficulty finding a charging document. We

12   found an incident report indicating he was charged with

13   assault. So there may be one additional criminal charge. We'll

14   offer up evidence to Your Honor to consider that during the

15   hearing. Beyond that, Your Honor, the government has no

16   additions or corrections to that pretrial services report.

17         **THE COURT:**  Okay.

18         Mr. Meetze, any objection to the information

19   contained in the report?

20         **MR. MEETZE:**  We don't have any objection to the

21   report as written. We reserve the right to object to the matter

22   that the Assistant U.S. attorney just referred to ---

23         **THE COURT:**  Okay.

24         **MR. MEETZE:**  -- since it's not in the report.

25         **THE COURT:**  Okay.

1          Well, I'll consider the information in the report

2    true for purposes of this hearing without additional matter

3    noted.

4          **MR. DANIELS:**  If I may, Your Honor, there is one more

5    matter I wanted to raise as to the pretrial services report. As

6    for his history of drug use and substance abuse, the government

7    will offer evidence through a witness today that there have

8    been numerous encounters with law enforcement to provide this

9    Court with some evidence that the defendant has had a drug

10   abuse issue for a number of years. I believe in the pretrial

11   services report, he disclosed only using marijuana as recently

12   as his arrest. When he was arrested, he was found with another

13   narcotic, mushrooms. In addition, Your Honor, I believe he did

14   not disclose cocaine use, but I'll refer back to the pretrial

15   services report.

16         All of that to say, Your Honor, I believe Your Honor

17   will hear more robust evidence about the defendant's history of

18   drug use than is in the pretrial services report based on what

19   he had represented to the Court. So we'll defer also to the

20   witness's testimony on that to the extent that Your Honor hears

21   additional evidence on that.

22         **THE COURT:**  Okay.

23         All right.

24         Well, if there's nothing further, call your first

25   witness.

1          **MR. DANIELS:**  Thank you, Your Honor.

2          The government's first witness is FBI Special Agent

3    Patricia Norden.

4          **THE CLERK:**  Please go right there where the Bible is.

5    Raise your right hand, place your left hand on the Bible, and

6    state your full name for the record.

7          **THE WITNESS:**  Patricia Norden.

8          **THE CLERK:**  Okay.

9                              **PATRICIA NORDEN**

10       having first being duly sworn, testified as follows:

11          **THE CLERK:**  Please be seated in the witness chair.

12          **THE COURT:**  All right.

13          Mr. Languerand, can you hear and see me okay?

14          **THE DEFENDANT:**  Yes, I can, Your Honor.

15          **THE COURT:**  All right.

16          And you can see the witness as well?

17          **THE DEFENDANT:**  Yes, I can.

18          **THE COURT:**  Okay.

19          If you have any trouble make sure that you get my

20    attention, okay?

21          **MR. DANIELS:**  Thank you, Your Honor.

22          First as for the exhibits, Your Honor, I discussed

23    this with defense counsel. There are 18 exhibits the government

24    has pre-marked, provided to the Court, provided to defense

25    counsel. I understand the defendant would like to reserve an

1  objection as to Exhibit No. 12. Reserving that objection the

2  defendant may make when we get to Exhibit 12, the government

3  would like to go ahead and move without objection from the

4  defense to admit Exhibits 1 through 18. We'll still lay the

5  foundation as appropriate as we go through them with the

6  witness. But for efficiency, we thought it may be prudent to go

7  ahead and ask to admit Exhibits 1 to 18.

8          **THE COURT:**  All right.

9          No objection from the defendant?

10         **MR. MEETZE:**  As -- as the U.S. attorney stated ---

11         **THE COURT:**  Other than No. 12.

12         **MR. MEETZE:**  --- we have an objection to No. 12, but

13  to none of the others. And that's where -- that's our position

14  at this time.

15         **THE COURT:**  Okay.

16         All right.

17         So admitted.

18         **MR. DANIELS:**  Thank you, Your Honor.

19     (Government's Exhibits 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11,

20  13, 14, 15, 16, 17, and 18 are admitted into the record.)

21                         **DIRECT EXAMINATION**

22  **BY MR. DANIELS:**

23  **Q**   Special Agent Norden, can you please introduce yourself to

24  the Court? Tell the Court who you are, what agency you work

25  with, and in what capacity you became involved in this case?

Patricia Norden - Direct Examination by Mr. Daniels                    7

1    **A**    I'm Special Agent Patricia Norden. I am permanently

2    assigned to the New York field office. Can I take this off?

3                **THE COURT:** Yeah, when you are speaking.

4                **THE WITNESS:**  I'm permanently assigned to the New

5    York office, was sent down to Columbia, Myrtle Beach RA on a

6    temporary assignment to help with counterterrorism matters. I

7    spent the last 10 years investigating counterterrorism up in

8    New York, but 13 years as a special agent.

9    **BY MR. DANIELS:**

10   **Q**    Okay.

11   **A**    So I arrived down here the beginning of April.

12   **Q**    Okay.

13          Are you now assisting in the investigation of the

14   defendant who is present by video in the courtroom?

15   **A**    Yes.

16   **Q**    And you were the affiant on the criminal complaint when he

17   was charged out of D.C. and the search warrant which this Court

18   granted in the District of South Carolina; is that correct?

19   **A**    Yes.

20   **Q**    All right.

21          We're here for two matters, Special Agent, first is a

22   preliminary hearing where the Court will consider if there's

23   probable cause to believe the defendant violated the five

24   statutes he's been charged with and the second is a hearing on

25   the question of detention of bond.

1      First, I'm going to start with preliminary hearing

2   questions and ask you to go through the facts of what happened

3   on January 6 so that we can offer up to this Court some

4   evidence that there's probable cause to believe he violated

5   those five statutes. Can we start with January 6? What was

6   scheduled to happen at the United States Congress on January 6?

7   **A**      January 6 was set to be the certification of the 2020

8   election, the Electoral College joint session of Congress was

9   set to meet to certify those votes to declare a winner for the

10  election.

11  **Q**      And was the certification of the count of the Electoral

12  College following the Presidential election, is that a

13  protected function of Congress?

14  **A**      Yes.

15  **Q**      Was that function disrupted by a violent riot -- by a mob

16  that day?

17  **A**      Yes.

18  **Q**      Tell the Court generally about that. I'm sure the Court is

19  familiar with it. Tell the Court generally what happened and

20  then we'll pivot to the defendant's conduct.

21  **A**      So at around 12:30, the crowd started to assemble near the

22  Capitol. There was some -- there had been various lines of

23  police barricades set up, ones that went out to the road, then

24  ones as you got closer and as you got closer to that. And the

25  crowd began advancing through those barricades.

1       At about one o'clock, the House chambers started their

2   session. At about 1:30, the House and the Senate adjourned and

3   separated for objection. As this was happening, the crowd

4   started gathering more and more outside.

5       At approximately two o'clock, some people in the crowd had

6   forced their way up and through some of these additional

7   barricades and to law enforcement. About 2:10, they forced

8   entry into the US Capitol, including breaking windows,

9   assaulted members of law enforcement and others. About 2:20,

10  members of the House, Senate, and Vice President were

11  instructed to evacuate the chambers. About 2:30, subjects broke

12  windows, pushed past the U.S. Capitol Police, forced their way

13  into the US Capitol on both the west and east side of the

14  building. 2:45, they broke into House Speaker Nancy Pelosi's

15  office. And then 2:47, broke into the Senate chamber. So

16  they –– as the time was going on, they were periodically

17  advancing more and more into the Capitol Building –––

18  **Q**   Okay.

19  **A**   ––– from there.

20  **Q**   And during that conduct, did hundreds, in fact, invade the

21  Capitol for lack of a better word?

22  **A**   Yes.

23  **Q**   As a result, did members of Congress have to evacuate the

24  chamber and end the congressionally-protected function of

25  certifying electoral results?

Patricia Norden - Direct Examination by Mr. Daniels                    10

1    **A**    Yes, they did.

2    **Q**    Okay.

3          And I understand roughly between 3:30 and 6:30, law

4    enforcement was working to clear the Capitol of the rioters; is

5    that correct?

6    **A**    Yes.

7    **Q**    Sometime during that window around 5 o'clock p.m., is that

8    when the defendant, Mr. Languerand, engaged in some violence

9    toward law enforcement?

10   **A**    Yes.

11   **Q**    Okay.

12         Tell the Court what Mr. Languerand did at that riot, and

13   how we know it was him.

14   **A**    So approximately 5 p.m., we had recovered a tip from

15   Witness 1 that there were photos that were posted on the

16   subject, Mr. Languerand's, Instagram and Reddit accounts saying

17   that this was him, depicting the clothing he was wearing that

18   day, selfies of him in the vicinity. The video we recovered

19   showed him throwing numerous items into the, I guess what you

20   would call, the police line over the police with their riot

21   shields.

22         One of the items in particular was a orange traffic cone,

23   but not a little cone, like a big size cone where previously in

24   the video you see someone try to throw that same barricade into

25   the line of police officers and they don't even make it to the

1   shields. But when Mr. Languerand picks it up, he's able to

2   pretty easily loft it over the heads of the police officers and

3   into -- into that section. You also see other smaller items

4   thrown by him toward the end of the video. We see that he has

5   one of the riot shields and he's chanting and pounding it on

6   the ground in, like, a threatening manner facing the officers.

7   And we see him kind of exit off into the video.

8   **Q**    Okay.

9       So the evidence has him throwing a orange barricade-like

10  object, smaller object. Did you testify bear spray, a bear

11  spray can?

12  **A**    It looked like a canister of bear spray. One of them

13  looked like it could have either been a police baton or a

14  broken piece of flag pole. It was something else that looked

15  like maybe -- it looked like it was giving out an orange liquid

16  when it was thrown, so maybe like a bottle of Gatorade or water

17  that had been colored, something that was also on the -- you

18  know, could be picked up from the steps.

19  **Q**    And where did this attack from law enforcement from the

20  defendant occur?

21  **A**    It occurred on -- in the same entranceway that you use for

22  the inauguration.

23  **Q**    Is it the Lower West Terrace tunnel?

24  **A**    The Lower West Terrace, that's right, where they come out

25  for the inauguration or other special events.

Patricia Norden - Direct Examination by Mr. Daniels                    12

1  **Q**    All right.

2       I'm going to ask Brittni to play Government Exhibit No. 1

3  please.

4       Special Agent, please tell the Court what they're going to

5  see when they see this video. It's going to be a video of the

6  Lower West tunnel?

7  **A**    Okay.

8       So this is the --

9            **THE COURT:**  Before you go forward, can he see?

10           **THE DEFENDANT:**  No, I cannot see the video,

11  Your Honor.

12           **THE COURT:**  Okay.

13           Let's see if we can fix that somehow. Is it on the

14  monitor?

15           **THE WITNESS:**  It's on the monitor in front of me,

16  yes.

17           **THE COURT:**  Yeah.

18           Wonder if we move that in a way where he can see

19  that.

20       (Pause in proceeding.)

21           **THE DEFENDANT:**  That's good, Your Honor. I see that.

22       (Pause in proceeding.)

23           **THE COURT:**  Okay.

24           All right.

25           **MR. DANIELS:**  Thank you, Your Honor.

1    BY MR. DANIELS:

2    Q    Special Agent Norden, I believe we're about to see a video

3    of the tunnel where the attack on law enforcement by the

4    defendant occurred. Is that correct?

5    A    Yes.

6    Q    Okay.

7            MR. DANIELS:  Ms. Welsh, if you could please play

8    Exhibit No. -- Government Exhibit No. 1.

9        (Exhibit is played at 3:14 p.m.)  ]

10       (Exhibit is stopped at 3:15 p.m.)

11   BY MR. DANIELS:

12   Q    Special Agent Norden, is that a video of the tunnel where

13   the defendant attacked law enforcement on January 6?

14   A    Yes.

15   Q    And I'm going to show the Court Government's Exhibit No. 2

16   which I believe shows the defendant at the Capitol riot

17   participating.

18       (Exhibit is played at 3:15 p.m.)

19       (Exhibit is stopped at 3:15 p.m.)

20           MR. DANIELS:  If you could pause it.

21   BY MR. DANIELS:

22   Q    Before we play this video, because there is a lot going on

23   in it, could you please orient the Court for where the

24   defendant will be in this video?

25   A    Like up -- I didn't mean to touch the screen. Like up in

1    that. Can I do that? Yeah, he gets pretty far up in this

2    vicinity here.

3    **Q**    And maybe the easiest way to do is, Special Agent, just

4    describe the hat he's wearing, where he's going to be in

5    relation to the shield so that when the video plays, the Court

6    can see where he is.

7    **A**    He was wearing -- it was a knit hat, like red, white, and

8    blue. Looked like a part of the -- like the flag. Had Trump on

9    it. He was wearing a black sweatshirt, Trump face mask. There

10   was a flannel shirt that kind of sticks out the back of the

11   sweatshirt.

12   **Q**    And in the beginning of the video will you see the orange

13   barricade-like object thrown by the defendant? In the beginning

14   of the video, is that when we'll see --

15   **A**    Towards the beginning on the video, yes.

16            **MR. DANIELS:**  Okay.

17            Ms. Welsh, if you could play Government Exhibit No. 2

18   please.

19        (Exhibit is played at 3:16 p.m.)

20            **THE WITNESS:**  There it is. Yep. That was it.

21        (Exhibit is stopped at 3:18 p.m.)

22   **BY MR. DANIELS:**

23   **Q**    Special Agent Norden, for the record, during that video,

24   did you see the defendant throw four objects at the -- at law

25   enforcement over their riot shields?

Patricia Norden - Direct Examination by Mr. Daniels                    15

1    **A**    Yes.

2    **Q**    And that was in the context of the violence at the Lower

3    West Terrace tunnel at the Capitol; correct?

4    **A**    Yes.

5    **Q**    I believe as we go forward in this video, will the Court

6    see him in possession of a U.S. Capitol Police riot shield?

7    **A**    Yes.

8    **Q**    And tell the Court what they are going to see and then

9    we'll play that portion of the video?

10   **A**    He has the -- the riot shield. He is holding it in a

11   pretty taunting matter, I would say pounding on the -- on the

12   pavement, chanting. As they are deploying their pepper spray,

13   he starts to use it to guard himself as he's coming back and

14   then he kind of walks off of the video.

15        (Exhibit is played at 3:19 p.m.)

16        (Exhibit is stopped at 3:20 p.m.)

17   **BY MR. DANIELS:**

18   **Q**    Special Agent Norden, during that video at some point, was

19   he in the very front line of the riot?

20   **A**    Yes.

21   **Q**    In fact, there was no one between him and the riot

22   shields, were there?

23   **A**    No.

24   **Q**    And in that context, based on your experience in

25   investigating these cases and your experience in this case, do

Patricia Norden - Direct Examination by Mr. Daniels                    16

1   you believe there's any question at this time whether this was

2   a political rally or whether it was a violent riot?

3   **A**     No, this appeared to be a riot.

4   **Q**     In that video, did he actually take possession of what

5   appears to be a Capitol police shield?

6   **A**     Yes.

7   **Q**     And in the video when he left the -- the frame of the

8   video, did he remain in possession of it?

9   **A**     He had appeared to, yes.

10  **Q**     And based on your review of these videos, were the rioters

11  leaving at this time as the Capitol police were deploying

12  pepper spray?

13  **A**     They were starting to come back. Some made a second push.

14  But that was part of the attempt to clear the area.

15  **Q**     Okay.

16         I'm going to ask Ms. Welsh to play Government Exhibit

17  No. 3, which I believe are going to be photographs of the

18  defendant at the Lower West tunnel during the attack. And

19  please tell the Court what they're looking at at Government's

20  Exhibit No. 3.

21  **A**     These are some of the -- this is the photo he posted on

22  social media. It says, "Remember this day forever. I love you

23  guys. Ask me about the" -- and then he has a symbol there. But

24  this is the clothing he was wearing that day. It looks like a

25  selfie-type photograph.

Patricia Norden - Direct Examination by Mr. Daniels                    17

1        Photo No. 2 is the photo of him throwing one of the

2    objects into and over the riot shields.

3        The next photo is him throwing the orange traffic

4    barricade.

5        The photo after that is the piece of pole or baton that

6    he's throwing over the riot shields. This is where -- it looks

7    like he is throwing the water bottle in. He's pretty close up

8    at that point.

9        And then the next photo is him in possession of the riot

10   shield, and you can see the Capitol police symbol.

11   **Q**    All right.

12       And for the record, you're looking at the third page of

13   Government Exhibit No. 3; is that correct?

14   **A**    Yes.

15            **MR. DANIELS:**  Could you show the Court Government

16   Exhibit No. 4 please, Ms. Welsh.

17   **BY MR. DANIELS:**

18   **Q**    And Special Agent Norden, please tell the Court what they

19   are looking at here?

20   **A**    These are the photos of inauguration. Again, they depict

21   the Lower West Terrace where the riots had taken place a couple

22   of weeks prior.

23   **Q**    And so for context, this is the same location, the same

24   tunnel where the defendant attacked law enforcement?

25   **A**    Yes.

1          **MR. DANIELS:**  Can you go to the next exhibit please,

2     Ms. Welsh?

3     **BY MR. DANIELS:**

4     **Q**    And what is the Court looking at now in Government's

5     Exhibit No. 5?

6     **A**    This is the aftermath of those riots. This is after the

7     riots had -- had occurred before they set up for the

8     inauguration.

9     **Q**    All right.

10         Special Agent Norden, if you could look at Government's

11    Exhibit No. 6 please. One of the questions for this Court is

12    whether there's probable cause to believe he was in a

13    restricted area. If you can point out for the Court towards the

14    bottom of this exhibit where is the Lower West Terrace tunnel

15    where this attack occurred?

16    **A**    Right here where the yellow is.

17    **Q**    And for the record, you are pointing just above the words

18    "Lower West Terrace" and below the word "grandstand;" is that

19    right?

20    **A**    Yes.

21    **Q**    Okay.

22         **MR. DANIELS:**  And Ms. Welsh, if you will go to

23    Government Exhibit No. 7 please.

24    **BY MR. DANIELS:**

25    **Q**    Special Agent Norden, what is the barrier shown in this

1    image?

2    **A**    The red line depicts the restricted area that day.

3    **Q**    Okay.

4         And is the Lower West Terrace tunnel within the restricted

5    area?

6    **A**    Yes, it is.

7    **Q**    Okay.

8         So before a Federal Judge in D.C. signed off on criminal

9    charges on the defendant, it seems to me there were at least

10   tipsters in the photo, the Insta -- Instagram photo and the

11   surveillance videos that the government had before the charges

12   were bought; is that correct?

13   **A**    Yes.

14   **Q**    And as for the strength of the evidence and the "probable

15   cause to believe whether he committed these crimes" question,

16   what was -- what did the government find at his house that

17   further corroborated the fact that the defendant committed this

18   conduct? Also please tell the Court what you heard on jail

19   calls that's additional evidence of the same.

20   **A**    In that house we found --

21           **MR. MEETZE:**  One moment please, Your Honor. (Pause.)

22           I object to any jail calls coming in. The government

23   hasn't provided that to us, Judge.

24           **MR. DANIELS:**  Your Honor, I could approach and give

25   you an idea of what the jail calls will be. I don't think

Patricia Norden - Direct Examination by Mr. Daniels                                    20

1    they're going to particularly change the Court's analysis. They

2    are relevant on the strength of the evidence. They are also

3    relevant on whether the defendant believes he'll be convicted

4    and sent to prison in this case. I did give him incident

5    reports and 18 exhibits pre-mark, and the government concedes

6    we did not give him jail calls.

7           We're not going to play them. We're just going to ask

8    the agent what she heard. I'd ask that -- if Your Honor directs

9    us not to, I'm happy to. But we were just going to ask her what

10   jail calls she heard.

11          **THE COURT:**  Is it something that -- I mean, if I had

12   a little bit better idea what it is, I might be able to answer

13   that a little better. I mean, is it something you can provide

14   him now?

15          **MR. DANIELS:**  I have a -- I'll give you an idea of

16   what he said now on the record.

17          **MR. MEETZE:**  That would sort of defeat the purpose,

18   Judge.

19          **MR. DANIELS:**  Sure.

20          **THE COURT:**  As far as notice to Mr. Meetze, is this

21   something that -- you know, are we talking about pages? Is it

22   something --

23          **MR. DANIELS:**  They will be audio files, and there

24   will be a total of about seven jail calls. The subject of them

25   are relatively limited for the purpose that I'd have the agent

1    offer some testimony on.

2          THE COURT: Well, I just want to give Mr. Meetze, you

3    know, some -- Mr. Languerand some due process. You know, if you

4    had the calls, it might be a little bit different if she

5    testified to that. But if you -- if you had the calls in

6    printed form, he needs -- I don't know if it's something that

7    he would need some time probably to talk to his client about to

8    have the opportunity to rebut.

9          MR. DANIELS: There is -- so there's no transcription

10   of the jail calls. They're all audio. I received them late

11   yesterday. Again, I'm happy to approach if that makes it

12   cleaner to tell you what the substance of them will be. I can

13   tell you generally what she would testified as to what they

14   would be. They would speak to the strength of the evidence, his

15   belief as whether he would get a bond, and his belief as

16   whether he would be convicted. But I certainly can see --

17         THE COURT: Why don't y'all approach just so that I

18   have some idea.

19       (Sidebar conference is held off the record.)

20         THE CLERK: Judge, I'm sorry, I can't hear. Can y'all

21   speak right into that? There you go.

22       (Sidebar conference is resumed off the record.)

23       (Sound system is activated; sidebar conference is held as

24   follows.)

25         MR. DANIELS: -- and No. 3, he says, "I think I'm

1    going to go to prison for a long time." Best case scenario, he

2    says six months to a year. Then he hears the statutory

3    penalties and repeats those and said, "I could be doing years

4    and years."

5    The relevance in the government's view --

6                    **THE COURT:**  Who was he talking to on the phone?

7                    **MR. DANIELS:**  A significant other, a female in

8    Vermont. No lawyer certainly.

9                    **THE COURT:**  Okay.

10                    **MR. DANIELS:**  He talks to his grandmother a little

11    bit. Grandfather and him are very short on the phone. They're

12    not as close. And he's generally telling everyone, "I've

13    screwed up. I'm in deep shit. I'm probably not going to get a

14    bond, and I'm probably going to go to prison."

15                    So that's the significance of it in the government's

16    view and totally an oversight.

17                    **THE COURT:**  That's fine.

18                    **MR. DANIELS:**  It would be that he believes he's going

19    to be convicted. He believes the evidence is strong. He

20    believes he's not going to get a bond. He believes he's going

21    to prison for it. I think that's just a strength of the

22    evidence question. And I apologize for --

23                    **THE COURT:**  That's fine.

24                    **MR. MEETZE:**  Are you waiting on me to say something?

25                    **MR. DANIELS:**  Yeah. I am.

Patricia Norden - Direct Examination by Mr. Daniels                    23

1          **MR. MEETZE:**  I think I still need to be able to talk
2    to him about it. I may have some kind of relevance objection. I
3    don't know, but I'll talk to him.
4          **MR. DANIELS:**  So do you want to take a recess? Is it
5    a way for him to have a private call with the defendant?
6          **THE COURT:**  Yeah. I can provide him that.
7          **MR. DANIELS:**  The government has -- I don't have
8    anything else on the jail calls. Beyond what I've just told
9    you, nothing else is coming out.
10         **THE COURT:**  Okay.
11         **MR. MEETZE:**  If I can talk to him and just say
12   generally what they are about and see what he says.
13         **THE COURT:**  Yeah. I mean, you can tell him.
14         **MR. DANIELS:**  Yeah, you can -- that's what the agent
15   would testify.
16         **MR. MEETZE:**  Okay.
17   Yeah. I need to talk to him.
18         **MR. DANIELS:**  I apologize.
19         **THE COURT:**  I understand. You know, I think I've got
20   to make an independent call on that. I mean, that's his
21   subjective belief. I understand what you're saying.
22         **MR. DANIELS:**  For efficiency's sake, now that you are
23   aware of what it is, would you just rather me move on?
24         **THE COURT:**  You know, I don't want to tell you, you
25   can't proceed.

1          **MR. DANIELS:**  Uh-huh.

2          **THE COURT:**  But I'll -- I'll leave it at that.

3          **MR. DANIELS:**  Yeah.

4          **THE COURT:**  You want to get through what you have?

5          **MR. DANIELS:**  Yeah. Why don't I get through what we

6  have, and Your Honor may say we have enough to make up our mind

7  here.

8          **THE COURT:**  Well --

9          **MR. DANIELS:**  I'm move past the --

10         **THE COURT:**  I don't want to interfere with your

11  ability to put on evidence. If you want to put on whatever you

12  have --

13         **MR. DANIELS:**  Okay.

14         **THE COURT:**  -- evidence and think about it. And if

15  you want to proceed with that, then we can break down and give

16  him ---

17         **MR. DANIELS:**  And my only --

18         **THE COURT:**  --- an opportunity --

19         **MR. DANIELS:**  Yeah. My perspective is this: I think

20  you'll probably have enough to make up your mind at the end of

21  the hearing. I think that -- I advised Chambers and defense

22  counsel that the D.C. U.S. attorney's office has asked us to

23  move to stay and to appeal if a bond is granted. I'm just

24  trying to think about whether that means this is going to

25  evidence and --

| | |
|---|---|
| 1 | **THE COURT:** Right. |
| 2 | **MR. DANIELS:** That's my only pause. Why don't we just |
| 3 | proceed and we can approach again. |
| 4 | **MR. MEETZE:** We can think about it at the end of the |
| 5 | case. |
| 6 | **THE COURT:** You may want to talk to him for some |
| 7 | other purpose. |
| 8 | **MR. MEETZE:** That's true. That's true. |
| 9 | **MR. DANIELS:** Thanks. |
| 10 | **THE COURT:** All right. |
| 11 | **MR. MEETZE:** Thank you, Your Honor. |
| 12 | (Sidebar conference is concluded.) |
| 13 | **THE COURT:** Okay. |
| 14 | Just don't answer that question right -- right now. |
| 15 | **MR. DANIELS:** Yes. |
| 16 | Thank you, Your Honor. |
| 17 | **BY MR. DANIELS:** |
| 18 | **Q** Special Agent Norden, you have already testified to the |
| 19 | evidence that the government had against the defendant before |
| 20 | the charges were brought and approved by a judge in D.C. Has |
| 21 | there been additional evidence recovered out of his house that |
| 22 | further corroborated that he committed these crimes? |
| 23 | **A** Yes. |
| 24 | **Q** Tell the Court about that please. |
| 25 | **A** We found clothing, the clothing from the video, the |

1  sweatshirt with the -- that said "George" across it. We found

2  the knit hat. We found the flannel shirt that was seen out of

3  the back of the sweatshirt and we found the face covering.

4  **Q**    Okay.

5       So you found four articles of clothing that he was wearing

6  on video during the riots in his house when it was searched

7  this week?

8  **A**    Uh --

9  **Q**    Late last week.

10 **A**    Thursday.

11 **Q**    Okay.

12      Turning to the flight risk and then danger questions,

13 Special Agent Norden, I believe we've covered sufficient

14 probable cause as to the five statutes he's been charged with.

15 If the Court has any questions, we'll be happy to return to

16 them. If the defense raises any issues, I'll be happy to return

17 to them as well. But now, I'm going to ask to pivot to the

18 detention hearing questions, okay?

19      The first factor is the flight risk as to whether the

20 defendant would appear in court when he's ordered and then

21 danger to the community. Does the defendant have a history of

22 failing to appear in court?

23 **A**    Yes.

24 **Q**    All right.

25      Tell the Court about what you found as to the defendant's

Patricia Norden - Direct Examination by Mr. Daniels                    27

1    failure to appear in court in Vermont in recent years.

2    **A**    The defendant failed to appear at a hearing for a, I

3    guess, order of protection that was filed.

4    **Q**    So there's an order of protection filed; is that correct?

5    **A**    Yes.

6    **Q**    And so in that order of protection, did a victim ask for

7    protection from the defendant?

8    **A**    Yes.

9    **Q**    Okay.

10    So this also speaks to dangerous -- dangerousness. In

11    that --

12          **THE COURT:**  Let me make sure I understood that. I

13    mean, you were asking her as to flight risk, and then you

14    bought up an order of protection.

15          What was your response?

16          **THE WITNESS:**  The defendant didn't appear in court --

17          **THE COURT:**  He didn't appear in court ---

18          **THE WITNESS:**  When they were --

19          **THE COURT:**  --- when they were seeking order of

20    protection?

21          **THE WITNESS:**  When they were signing the order of

22    protection when they were going -- making the final

23    determination.

24          **THE COURT:**  Okay.

25          **MR. DANIELS:**  Yeah.

Patricia Norden - Direct Examination by Mr. Daniels                    28

1              Thank you, Your Honor, for clarifying that.

2              So I'll ask Ms. Welsh to pull up Government's Exhibit

3    No. 8.

4    **BY MR. DANIELS:**

5    **Q**    And I'm showing you a document which has been marked as a

6    document from the Vermont Superior Court dated January 2019.

7    It's a petition for protective order. Tell the Court about this

8    document please.

9    **A**    This is an order of protection against the defendant,

10   having the defendant stay away from the victim.

11   **Q**    In looking at Page 1, what are the allegations the

12   defendant included in this affidavit?

13   **A**    That he placed him or her in fear of imminent serious

14   physical harm and stalked the -- the victim.

15           **MR. DANIELS:**  And if you can go to Page 2 please,

16   Ms. Welsh.

17   **BY MR. DANIELS:**

18   **Q**    How long did the victim ask to be protected from the

19   defendant?

20   **A**    I think the order was for about a year.

21   **Q**    And at the bottom, did the victim write how long the

22   victim would like the order to last in writing? Did the

23   victim --

24   **A**    Wanted the defendant to remain as far away as possible.

25   **Q**    As in distance. Thank you.

1          **MR. DANIELS:**  Looking at Page 3, Ms. Welsh.

2     **BY MR. DANIELS:**

3     **Q**    Tell the Court generally about this protective order. And

4     before you go into specific allegations, did -- according to

5     the petition for protective order, did the defendant threaten

6     to kill any person?

7     **A**    Yes.

8     **Q**    Who did the defendant threaten to kill according to this

9     petition?

10    **A**    The victim and the victim's associates. People associated

11    with the victim.

12    **Q**    And what about the defendant? Did the petition also allege

13    that he threatened to kill himself?

14    **A**    Yes.

15    **Q**    Okay.

16         And did the petition offer specific evidence as to what

17    the defendant said he would do with the bullet?

18    **A**    Yes.

19    **Q**    What did it say?

20    **A**    Said that he would put a bullet in their head.

21    **Q**    Okay.

22         The petitioner said he would put a bullet in their head.

23    Please look through this page now and tell the Court what this

24    victim in Vermont told a court in Vermont.

25    **A**    That in January 2019, that the victim made multiple --

Patricia Norden - Direct Examination by Mr. Daniels                    30

1    changed numbers multiple times in an attempt to contact the

2    victim and also stalking the victim on social media. Started

3    threatening the victim with texts and said he's going to kill

4    me, himself, or people associated with the victim.

5    **Q**    At the bottom of that page, there's also an allegation

6    that at a time this victim was going to go to a party, what did

7    the defendant, according to the victim, tell the victim when

8    the victim wanted to go to a party?

9    **A**    That if he wanted to, the -- he or she wanted to go to the

10   party that they would die if they went, if he found out that

11   that's where they went that night.

12   **Q**    Okay.

13         And that's where the victim actually said, "The defendant

14   said he would shoot me in the head;" correct?

15   **A**    Yes.

16   **Q**    And later that night, did the defendant, in fact, show up

17   where the victim was in that particular town?

18   **A**    That's what the defendant said. The defendant had told the

19   victim that he was in the town that the victim was in ---

20   **Q**    Okay.

21   **A**    --- and that he was going to make sure that they were not

22   at the party.

23         **MR. DANIELS:**  Go to the next page.

24   **BY MR. DANIELS:**

25   **Q**    Tell the Court about the allegations at the top of this

1  page.

2  **A**    Multiple texts over the years calling him derogatory

3  names. And he was saying that he was going to kill the victim

4  and himself. Alcohol and drugs always fueled these -- these

5  outbursts. At one point, he took the victim's car, took control

6  of the steering wheel and sent the car into a tree at 45 miles

7  an hour. Also in 2019, sent a threatening picture of the

8  defendant holding brass knuckles.

9  **Q**    Okay.

10    Special Agent, looking at this petition, in fact, on his

11  phone, did he also find photographs of brass knuckles?

12  **A**    Yes.

13  **Q**    And looking at this petition as well, did you also find

14  evidence that he's discussed taking his own life? There's at

15  least some evidence of that elsewhere?

16  **A**    Yes.

17  **Q**    Is there also evidence beyond this petition that the

18  defendant uses and abuses alcohol and drugs?

19  **A**    Yes.

20  **Q**    Okay.

21        **MR. DANIELS:**  Go to the next page.

22  **BY MR. DANIELS:**

23  **Q**    Tell the Court what you see in this last page of the

24  petition please.

25  **A**    Just another incident where he forced the victim to take,

1  I guess, possession of his -- his dogs. She said -- he said

2  that they couldn't and, you know, not wanting to cause a

3  disturbance in the apartment area where the victim was living,

4  he kind of just forced the dogs on them and shut the door.

5  Again, shoved the victim.

6  **Q**    Okay.

7       So following that petition, did the Superior Court, Family

8  Division, in Vermont to consider this petition and consider

9  whether to protect the victim from any additional violence or

10 threats from the defendant?

11 **A**    Yes

12         **MR. DANIELS:**  Please turn to Exhibit 9, Ms. Welsh.

13 **BY MR. DANIELS:**

14 **Q**    Tell the Court what this final order is?

15 **A**    This is the final order of protection ---

16 **Q**    And --

17 **A**    --- that --

18 **Q**    I'm sorry. Go ahead.

19 **A**    In --

20 **Q**    On Page 1, what did the Court order as to the defendant?

21 **A**    That the defendant be restrained from committing further

22 acts of abuse or threats of abuse and the defendant shall have

23 no contact with the plaintiff.

24 **Q**    And looking at Page 2, what are the five findings of the

25 Court? And I think when the Court turns to Page 3, the Court is

1    going to see that three different Judges signed off on this.

2    What were the findings of the Court in that matter in Vermont?

3    **A**    The defendant has caused physical harm, attempted to cause

4    physical harm, placed him or her in fear of imminent, serious

5    physical harm, stalked the plaintiff and that there is a danger

6    of further abuse.

7    **Q**    Okay.

8         So stalking, physical harm, threats, placing the victim in

9    fear and if there is a danger of further abuse, those were the

10   findings of that Court?

11   **A**    Yes.

12   **Q**    And turning to the next page, was that approved by three

13   different Judges in Vermont?

14   **A**    Yes, it was.

15   **Q**    Above those Judges's signatures, there was some distance

16   the defendant was ordered to stay away from the victim; is that

17   correct?

18   **A**    Yes.

19   **Q**    Turning to the next page, did this Court also advise the

20   defendant that he -- at least at the time of this protective

21   order, was prohibited from possessing firearms?

22   **A**    Yes.

23   **Q**    Okay.

24        And turning to a last page, tell the Court what the Judge

25   wrote about the defendant's willingness to appear in court in

Patricia Norden - Direct Examination by Mr. Daniels                                                    34

1    Vermont on this matter?

2    **A**    No record of the defendant appearing.

3    **Q**    In fact, does it say that the defendant failed to appear

4    despite service in that matter?

5    **A**    Yes.

6    **Q**    Okay.

7         Special Agent Norden, on the flight risk questions, before

8    we pivot more into dangerousness, I'm going to ask you also

9    about what -- what in your investigation have you found as to

10   whether the defendant has deep roots in this community in this

11   state as to whether he is even from South Carolina and whether

12   he's sort of more transient or develops deep roots?

13   **A**    Defendant has only lived in South Carolina since

14   mid-January after the events of January 6.

15   **Q**    So he actually moved here after the Capitol?

16   **A**    Yes.

17   **Q**    From a different state?

18   **A**    He moved here from Vermont. It appeared that Vermont had

19   been his hometown, aside from living in North Carolina at one

20   point. When he moved down to South Carolina, he moved in with

21   grandparents who had relocated to here as well.

22   **Q**    Have you found evidence that he's lived in a number of

23   different states over the years?

24   **A**    Yes.

25   **Q**    He's lived at least in North Carolina, Vermont, and now

Patricia Norden - Direct Examination by Mr. Daniels                    35

1    South Carolina in recent months; is that correct?

2    **A**    Yes.

3    **Q**    And has he also had driver's license in all three states?

4    **A**    Two of the three. He has a driver's license in Vermont and

5    North Carolina.

6    **Q**    Okay.

7          What about his willingness to travel across state lines?

8    What'd you find about how he traveled from Vermont to D.C. to

9    participate in the riots?

10   **A**    Our understanding from interviews was that he met up with

11   someone that he talked to online and kind of hitched a ride

12   down to D.C. with them.

13   **Q**    Okay.

14         So he met someone on the Internet, got in their car, and

15   drove from Vermont to D.C.?

16   **A**    Yes.

17   **Q**    Are you also aware that he has a passport?

18   **A**    Yes.

19   **Q**    And has he, in fact, posted photographs of his passport

20   together with his guns?

21   **A**    Yes.

22   **Q**    Okay.

23         Are you also aware that he's traveled internationally to

24   Mexico and Canada?

25   **A**    Yes.

1  **Q**    Okay.

2       Let's talk about his employment history and whether it's

3  stable, whether it's more permanent, whether that, like his

4  living situation, is also more transient. What have you found

5  with respect to his employment history?

6  **A**    Seems to go from job to job and doesn't hold down a job

7  for I would say -- I'm trying to think -- probably not even for

8  more than a year at a time, was on unemployment at the time

9  when he came down to South Carolina. From what we understand,

10 was employed here on the date of his arrest and his boss was

11 notified ---

12 **Q**    Okay.

13 **A**    --- of what was going on.

14 **Q**    And in the last few years, have you found that he's had a

15 number of different jobs, he doesn't keep them for a long

16 period of time?

17 **A**    Yes, it appears.

18 **Q**    Is that fair?

19 **A**    Uh-huh.

20 **Q**    Let us now turn to the factors that speak to dangerousness

21 and his stability whether he would be an appropriate candidate

22 for a bond given his last few years. Special Agent Norden,

23 before we go through the different incidents, have you found

24 that he's been sort of in a downward spiral, had a particular

25 pattern for the last few years?

1    **A**    Yes.

2    **Q**    Tell -- tell the Court in your own words -- how about that

3    rather than me putting words in your mouth. Tell the Court what

4    you found generally in the last number of years based on police

5    reports, calls for service, his employment history, his history

6    with the military. What have you found with respect to his

7    stability in the last number of years?

8    **A**    Well, as far as the military, it appeared that he was

9    released from -- discharged from the military after an admitted

10    use of cocaine while there.

11    **Q**    When was he discharged from the military? What year?

12    **A**    2018, I believe.

13    **Q**    2018? And in that, what was his drug of choice at that

14    time?

15    **A**    Cocaine.

16    **Q**    It was cocaine?

17    **A**    At that time.

18    **Q**    When he was discharged from the military or separated, it

19    was honorable, is that correct, or administrative?

20    **A**    Administrative but honorable, I believe.

21    **Q**    And did he admits to drug use for an extended period of

22    time when he was discharged?

23    **A**    Yes.

24    **Q**    Okay.

25    So that was in 2018. In 2019, in January, is when we get

Patricia Norden - Direct Examination by Mr. Daniels                    38

1    the protective order where he threatened to kill himself, the

2    victim, the victim's associates, put a bullet in the victim's

3    head. That takes us into January 2019. I'm now going to walk

4    through a few incident reports that give us a picture of his

5    conduct when he is on release, okay?

6    **A**    Okay.

7    **Q**    In February 2019, I understand that the Morristown Police

8    Department gathered evidence that showed on Facebook Messenger

9    the defendant was involved in drug distribution; is that

10   correct?

11   **A**    Yes.

12   **Q**    Tell the Court generally about that, what you found.

13   **A**    A tip came into the police department that he was going to

14   be distributing a small amount of drugs that day. And there was

15   some Facebook messages going back and forth with the potential

16   buyer. They seemed to realize that they were being followed, so

17   the deal never took place. But there was evidence of them

18   trying to meet up at a couple of different locations.

19   **Q**    Okay.

20        That's in February 2019. What about on March 8, 2019?

21   Again, Morristown Police Department conducted a traffic stop.

22   And I believed by the end of that traffic stop, he told the

23   police "mother effers," "effing 'c' word, I hate the cops."

24   Tell the Court about that traffic stop?

25        **THE COURT:**  And this is Morristown, Vermont?

1          **MR. DANIELS:**  Yes, Your Honor.

2          **THE WITNESS:**  Yes.

3          **THE COURT:**  Okay.

4     **BY MR. DANIELS:**

5     **Q**    This is going to be the March 8, 2019, stop when he had a

6     traffic violation for an exhaust that was louder than

7     permitted. How did the defendant respond to law enforcement at

8     that stop?

9     **A**    They didn't really care who they were. He was pretty

10    upset. He started calling law enforcement names.

11    **Q**    Did he call them "effing 'c' words"?

12    **A**    Yes.

13    **Q**    And did he say, "I hate the cops"?

14    **A**    Yes.

15    **Q**    And did he call the cops "mother effers"?

16    **A**    Yes.

17    **Q**    Did one of the cops say that he began to yell and scream

18    and become belligerent?

19    **A**    Yes.

20    **Q**    And that was on March 8. Fast-forward five days. The

21    Vermont State Police then encountered him. This is March 13,

22    2019. There was an assault in a vehicle where somebody

23    brandished a gun and a knife. He grabbed it. And then he,

24    quote, pounded that person. Can you tell the Court about that

25    assault?

1    **A**    It appeared that this guy was in the vehicle with the

2    defendant and one other person. And like you said, this guy had

3    a gun and a knife. The defendant grabbed the knife from him and

4    admitted to pounding the guy, threw him out of the car with

5    inadequate clothing, no shoes. And it was March, so it was

6    still snow up in Vermont. They found him that -- found the

7    victim on the, you know, side of the road that way.

8    **Q**    And was -- is that the matter in which there is some

9    evidence according to the incident report that the defendant

10   was charged with assault in Vermont?

11   **A**    Yes.

12   **Q**    Okay.

13       But admittedly, we have not found the disposition for that

14   matter, have we?

15   **A**    No, just the article.

16   **Q**    Okay.

17       So that's March 2019.

18       Fast-forward to the next month, April 2019. There's a

19   county sheriff's office in Vermont, the Lamoille County

20   Sheriff's Office, that was -- had a call for service when the

21   defendant was out of control, pushing people, breaking things,

22   where he allegedly either buying narcotics --

23            **THE COURT:**  Let me interrupt you just --

24            **MR. DANIELS:**  Yeah.

25            **THE COURT:**  Let me real quick -- talk to y'all real

Patricia Norden - Direct Examination by Mr. Daniels                    41

1    quick.

2         (Sidebar conference is held on the record.)

3              THE COURT:  (Indiscernible.)

4              MR. DANIELS:  Too much leading?

5              THE COURT:  Instead of you testifying, I want her to

6    testify.

7              MR. DANIELS:  All right.

8              THE COURT:  And I'm not seeing the police report

9    (Indiscernible).

10             MR. DANIELS:  Yeah. She didn't have a police report

11   until we get to the next couple of marked exhibits ---

12             THE COURT:  Okay.

13             MR. DANIELS:  --- because I thought these were less

14   significant.

15             THE COURT:  (Indiscernible.)

16             MR. DANIELS:  But I'll stop leading.

17             THE COURT:  I am all -- I'm all for --

18   (Indiscernible).

19             MR. DANIELS:  Yes.

20             THE COURT:  Okay.

21             Thank you.

22        (Sidebar conference is concluded.)

23   BY MR. DANIELS:

24   Q    Special Agent Norden, when we left off I was asking you

25   about an incident in April 2019 involving the Lamoille County

1    Sheriff's Office where there was a call for service. Can you

2    tell the Court about that matter?

3    **A**    The -- I'm confused as to which one specifically.

4    **Q**    Sure. Do you recall a matter in which the defendant was

5    reported for being out of control and pushing people around?

6    **A**    I recall there was a report. I mean, there were -- there

7    were a few others that I know happened as well.

8    **Q**    That's fine. I don't have that report in front of you.

9    We'll just move on to the next one. How about that?

10   **A**    Okay.

11          **MR. DANIELS:**  I'm going to ask Ms. Welsh to pull up

12   Exhibit No. 10, which is a May 22, 2020, report from the

13   Lamoille County Sheriff's Office. Ms. Welsh, if you could

14   proceed to the page that has the narrative. It will be a number

15   of pages in.

16   **BY MR. DANIELS:**

17   **Q**    Special Agent Norden, could you tell the Court about this

18   incident in May 2020 where the sheriff's office is called to

19   respond to the defendant?

20   **A**    This is when there were three -- three juveniles who had

21   said that there was a man who had pointed a gun at them when

22   they were out in the woods. When the cops went to the

23   residence, they encountered the defendant who, you know, lived

24   in his trailer backed up to the woods there. Dogs started

25   running at the officer and again the defendant said that he

1    didn't give an eff who the officer was and if he shoot the dog,

2    he will shoot -- you know, "I'll shoot you."

3    Q    So what did the defendant say to the police?

4    A    He said, "If you shoot my dog, I'll shoot you."

5         So they -- they spoke with him. He admitted that he had

6    had the gun. He said that him and his friend had just come back

7    from a house where they were engaging in satanic rituals.

8    Q    So what did the defendant say they were doing that day?

9    A    That they had been the engaging in satanic-like rituals

10   with friends.

11   Q    And what did the -- what did the defendant -- I apologize

12   for interrupting -- admit that he had done with the gun at that

13   time when the juveniles walked by?

14   A    That he racked it. He just said he didn't point it at

15   anybody, but he did rack it. And his friend said that he was

16   pointing it up in the air. The juveniles claimed that it was

17   pointed at -- thought that it was pointed at them. He admitted

18   that he had the firearms, that he felt he needed to protect

19   himself and his property, and that he was paranoid about what

20   they were doing there.

21   Q    And what did law enforcement tell him about whether

22   someone, in fact, was following him or not?

23   A    He thought someone was following him home from the -- the

24   friend's house. So he had started feeling -- when he

25   encountered these people on the property, he thought that they

1    were part of the group that had been following him.

2    **Q**    Did law enforcement tell him that -- what did law

3    enforcement tell him, in fact, that the two juveniles were

4    doing?

5    **A**    That they were just looking for a place to hang out and

6    have a party.

7    **Q**    Okay.

8         Turning to Government Exhibit No. 11, that was from

9    May 2020. I'm now going to ask you about a July 2020 incident.

10   This is from the Morristown Police Department.

11         **MR. DANIELS:**  If you could, Ms. Welsh, scroll to the

12   narrative section.

13   **BY MR. DANIELS:**

14   **Q**    I understand the police were called related to -- the

15   defendant, rather, called the police in this incident. Please

16   tell the Court what happened in this incident.

17         **THE COURT:**  This is 12, isn't it?

18         **MR. DANIELS:**  This is 11. This is -- this is not the

19   one that he has an objection to.

20         **THE COURT:**  Okay.

21   **BY MR. DANIELS:**

22   **Q**    So if you could please tell the Court what the defendant

23   reported to the police when he called.

24   **A**    He was complaining about -- he said there were signs of

25   pedophilia that were painted on the Jersey barriers that were

1  put in front of Pizza on Main at a dance studio. He said that

2  it was a dance studio, said that it was a front for exploiting

3  children because of its provocative pictures on the website.

4  **Q**    So that's what the defendant had reported to the police?

5  **A**    The male caller that wanted to remain anonymous, yes.

6  **Q**    Okay.

7        And who was the caller later identified as?

8  **A**    The defendant.

9  **Q**    Okay.

10        **MR. DANIELS:**  Go to the next page.

11  **BY MR. DANIELS:**

12  **Q**    And did the police department have to respond to the

13  defendant and tell him, in fact, what the drawings were?

14  **A**    Yes. He said that they were just meant -- the drawings

15  were just meant to beautify the Jersey barriers that had been

16  put up to create, like, an outdoor dining-type space because of

17  the COVID pandemic and that community members had actually

18  volunteered and assisted in painting them and beautifying them

19  and they were --

20  **Q**    Okay.

21  **A**    -- in no way were they symbols of pedophilia.

22  **Q**    So in other words, the police told him that they were

23  community drawings in the downtown area. Special Agent Norden,

24  does this start a pattern of engagement with law enforcement on

25  a particular issue that he seems to be -- the defendant seems

1   to be obsessed with or interested in?

2   **A**    Yes.

3   **Q**    Tell the Court what the pattern of additional law

4   enforcement reports that we'll go through are going to show

5   beginning with the one you just testified about.

6   **A**    Pedophilia basically. He seems to feed into that -- that

7   narrative that a lot of the complaints are about pedophilia and

8   different incidences.

9   **Q**    So will the defendant in other incidences call the police

10  and complain about child sex rings and pedophilia in various

11  places of the public?

12  **A**    Yes. There's -- can I say what?

13  **Q**    Sure.

14  **A**    There was a couple of pizza parlors that he had claimed

15  were running child sex rings out of the basement of their pizza

16  place.

17  **Q**    Okay.

18       And is this a -- in your investigation both in this case

19  and more broadly the Capitol riots, have you investigated

20  defendants who are committed to QAnon conspiracies?

21  **A**    The FBI has, yes.

22  **Q**    Yes. And does the defendant himself have any particular

23  commitment based on what you've reviewed from his home to that

24  movement?

25  **A**    It would appear so. There were stickers and other notes

1  that were recovered from the home.

2  **Q**    And is it -- an interest in pedophilia, is that consistent

3  with the known QAnon theory?

4  **A**    Yes. It was investigated again that there was a child sex

5  ring being run out of the D.C. Pizza Parlor out of their

6  basement, which didn't exist.

7  **Q**    Okay.

8       So I'm going to move to Government Exhibit No. 12. I

9  understand the defendant will have an objection to it. Special

10  Agent Norden, have you also reviewed a report from July 2020

11  that would be six days afterwards, on July 25, regarding the

12  defendant's engagement with a mother and her child on that

13  particular issue of pedophilia?

14  **A**    Yes.

15  **Q**    If you could pull up Government Exhibit No. 12 and please

16  go to the narrative section. Tell the Court what -- what you

17  found -- what you found in reviewing these police reports as to

18  what the defendant was doing with this mother and -- and her

19  daughter?

20  **A**    That he was yelling that -- they were at a Black Lives

21  Matter protest. He was yelling at them about -- yelling at the

22  protesters about pedophilia and made them uncomfortable and

23  reported the behavior.

24           **MR. DANIELS:**  Yeah. This page. That's all right.

25  **BY MR. DANIELS:**

Patricia Norden - Direct Examination by Mr. Daniels                    48

1    Q    And in --

2         **THE COURT:**  Let me ask you -- I want to make sure

3    there's no identifying information in here as to if there's a

4    minor involved.

5         **MR. DANIELS:**  There's not, Your Honor. We have

6    redacted the names and identifying information of any victims

7    in the case. The only victims that will be -- still in these

8    incident reports are the victim businesses where the defendant

9    showed up and said there's a child sex ring in the basement of

10   this pizza shop. Any individuals' names have been redacted as

11   have DOBs, SSNs, and home addresses. And certainly, if there's

12   an omission, we'd ask for leave of the Court to fix that

13   redaction. Anything that's appropriate, for example, the

14   petition for protective order or Mr. -- or the defendant's

15   writings, we'd be happy to file under seal those exhibits if

16   the Court believes some of those are of a personal nature and

17   that would be more appropriate.

18        **THE COURT:**  Okay.

19        **MR. DANIELS:**  Your Honor, I have been informed that

20   in our redaction policy, we left the names of individual

21   victims, but we did take out their addresses, their DOB's,

22   SSN's and PIIs.

23        **THE COURT:**  Well, I -- okay.

24        There is -- there is one in that exhibit.

25        **MR. DANIELS:**  And that's an error. We will correct

Patricia Norden - Direct Examination by Mr. Daniels                    49

1   that if it's in Exhibit No. 12.

2           Your Honor, on the -- in the final page of Exhibit

3   No. 12, I believe that's the defendant's year of birth.

4   However, we'll, after this hearing, certainly review that ---

5           **THE COURT:**  Okay.

6           **MR. DANIELS:**  --- to make sure we didn't miss

7   anything there.

8           **THE COURT:**  Okay.

9           **MR. DANIELS:**  The government moves to admit Exhibit

10  No. 12 into evidence.

11          **THE COURT:**  Any objection?

12          **MR. MEETZE:**  We object to this one, Judge, because

13  this one seems to have taken place during some sort of protest.

14  The -- the incident doesn't sound like it was significant. The

15  participants just separated and moved away. And it just seems

16  like that -- that occurred in protected speech type thing. It

17  just doesn't seem like it rises to the level of the other

18  complaints that the government has offered on some of these

19  other exhibits.

20          **MR. DANIELS:**  The government would respond that it

21  goes to weight, not admissibility. And if Your Honor doesn't

22  believe it should carry any weight, then that will be perfectly

23  fine.

24          **THE COURT:**  I'll admit it and give it whatever weight

25  I think is appropriate.

Patricia Norden - Direct Examination by Mr. Daniels                    50

1          **MR. DANIELS:**  Thank you, Your Honor.

2          (Government's Exhibit No. 12 is admitted into the record.)

3    **BY MR. DANIELS:**

4    **Q**    Moving to Exhibit No. 13, Special Agent Norden, fast-

5    forwarding one month now, we're in August 2020. The Burlington

6    Police Department was called to respond to threats and

7    harassment.

8          **MR. DANIELS:**  If you would go to the narrative

9    section please.

10   **BY MR. DANIELS:**

11   **Q**    Special Agent Norden, if you could please tell the Court

12   about this August 2020 incident with the Burlington Police

13   Department please.

14   **A**    That they had been receiving threatening messages from the

15   defendant on their Instagram page for the business. They

16   attempted to block him, but he continued to get through. And

17   again, that they were running a child sex slave operation in

18   the basement of their restaurant which, again, was another

19   pizza establishment in the area.

20   **Q**    So is this a different pizza shop than the last one in a

21   different city?

22   **A**    Yes.

23   **Q**    Okay.

24         And what was the defendant alleging was happening at this

25   pizza shop?

Patricia Norden - Direct Examination by Mr. Daniels                    51

1    **A**    That -- how they were a part of the sex slave trade due to

2    a symbol that they used for the business's marketing campaign

3    and that it was a pentagram with the words, "Drink beer, heil

4    pizza" on it and that that's what they believe upset the

5    defendant. They were concerned for the safety of the employees

6    because once they started looking into the defendant and the

7    photographs and stuff that he had posted of himself on

8    different social media, he had firearms and the Guy Fawkes

9    mask.

10   **Q**    And how did this sheriff's office respond when they were

11   notified that the defendant was the person responsible for

12   this?

13   **A**    They -- again, the owners were concerned for the safety of

14   the employers. They said that when the sheriffs told them that

15   if he comes to the business -- the defendant comes to the

16   business, that he will be issued an order and removed from the

17   property and that they would continue to attempt to block the

18   messages from him.

19   **Q**    Did law enforcement have to come up with a safety plan for

20   this business?

21   **A**    Yes, they did.

22   **Q**    And did law enforcement say that they had frequently dealt

23   with the defendant?

24   **A**    Yes.

25   **Q**    For similar behavior?

1    **A**    Yes.

2    **Q**    Moving on past that August 2020 incident now to

3    September 2020, I'm going to move to Government Exhibit No. 14.

4    Morristown Police Department now. There's a threat and

5    harassment call for service related to the defendant reaching

6    out to the city -- a city employee.

7           **MR. DANIELS:**  Go to the narrative section.

8    **BY MR. DANIELS:**

9    **Q**    Special Agent Norden, if you could please tell the Court

10   about this September 2020 incident with the City.

11   **A**    Again, this defendant was complaining about the paintings

12   on the Jersey barriers. He had left some -- some voicemail.

13   They recognized the voice. He goes on about new paintings on

14   the barriers and how they attempted to cover up some of the

15   pedophilia symbols, but not all of them. And Defendant goes on

16   to leave on the voicemail that he will be watching the victim

17   and knows what he looks like.

18   **Q**    Okay.

19          So that was in September 2020. The conduct for which he

20   was charged came in January 2021, three or four months later;

21   is that correct?

22   **A**    Yes.

23   **Q**    And are you aware of the impact that attack had on the

24   Capitol police? Have you had an opportunity to speak with the

25   Capitol police about the number of officer injuries, for

Patricia Norden - Direct Examination by Mr. Daniels                53

1    example, that they sustained as a result of that mob?

2            **MR. MEETZE:**  Judge, I object to this unless they can

3    produce some evidence that this defendant specifically caused

4    the specific injuries. They -- I don't believe that they will

5    be allowed to discuss in general what happened in the whole

6    scope of the incident on January 6.

7            **MR. DANIELS:**  Sure.

8            Your Honor, all that the government would offer is

9    that he was a part of the violent mob that attacked law

10   enforcement and Special Agent Norden wanted to tell the Court

11   that 180 officers were injured. I thought that would be

12   relevant. But if Your Honor would like us to move on, we'll be

13   happy to.

14           **THE COURT:**  How do you think it's relevant to his

15   conduct?

16           **MR. DANIELS:**  It's relevant because he participated

17   in that mob at 5 p.m. when it is very clear that it was

18   violence. It was an insurrection of the Capitol. It was the

19   most violent part of the mob. He threw four objects, assaulted

20   the cops. A Judge in D.C. has signed off on that complaint. And

21   I think that it is relevant that the mob that he participated

22   in, in fact, did injure law enforcement officers. There were

23   injuries as a result.

24           **THE COURT:**  If there were some in that particular

25   location or just in general all -- all around?

Patricia Norden - Direct Examination by Mr. Daniels                    54

1          **MR. DANIELS:**  I was just going to ask her the effect

2     on the agency that he attacked. We know they were U.S. Capitol

3     Police. I was going to ask the effect on the U.S. Capitol

4     Police. But if Your Honor would like me to move forward, I can

5     do that.

6          **THE COURT:**  Well, are you presenting that as to the

7     bond matter as to the danger?

8          **MR. DANIELS:**  I think it is certainly relevant to

9     dangerousness. It is the context in which he assaulted the

10    cops. He threw these objects at law enforcement in the context

11    of a violent riot and a number of officers were injured in that

12    riot. I think it's relevant just to tell the Court the full

13    picture of what happened to the officers who were attacked that

14    day.

15         **THE COURT:**  I don't know that I find that so

16    relevant. It could be if there was a foundation as to, you

17    know, they had a concerted effort and there were discussions

18    before that.

19         **MR. DANIELS:**  Uh-huh.

20         **THE COURT:**  I don't have that before me.

21         **MR. DANIELS:**  Okay.

22         **THE COURT:**  What I have is what you presented is that

23    he was in that particular location and clearly I saw what was

24    in the video.

25         **MR. DANIELS:**  Okay.

1           **THE COURT:**  As far as, you know, officers were

2    injured on the other side of the Capitol with some other

3    particular weapon, I mean, I think it needs to be relevant as

4    to the scope of what --

5           **THE COURT:**  -- based on the foundation of what you

6    put in.

7           **MR. DANIELS:**  Sure. We have other ground to cover,

8    and we can do that, Your Honor.

9           Special Agent Norden --

10           Thank you, Your Honor.

11   **BY MR. DANIELS:**

12   **Q**    Special Agent Norden, moving forward beyond that

13   September 2020 conduct, you've already testified to his

14   January 2020 conduct; correct?

15   **A**    Yes.

16   **Q**    And when a witness named Witness 1 in the complaint and

17   search warrant called FBI to report the defendant participated

18   in the riots, did he tell the FBI something about the

19   defendant's stability and in that witness's view whether he

20   should be detained?

21   **A**    Yes.

22   **Q**    First, what was the foundation of that witness's

23   knowledge? How long did the witness say he knew -- known the

24   defendant?

25   **A**    The witness had known the defendant at least going back to

Patricia Norden - Direct Examination by Mr. Daniels                    56

1  high school.

2  **Q**   At least going back to high school. And what did the

3  witness say --

4           **MR. MEETZE:**  Judge -- Judge, I have an objection to

5  this line of questioning. All I have is a complaint. It said

6  there was a witness that identified the witness from a social

7  media picture. There's no other information that we've been

8  provided about any background or who this person is. If they're

9  going to get into all that, I'll need to know who this person

10 is so I can conduct an investigation into their background and

11 any motivation they may have to misrepresent facts about this

12 defendant.

13          **MR. DANIELS:**  Your Honor, it is not in the complaint

14 affidavit. It is in the search warrant affidavit. It's already

15 been before Your Honor. It's a -- it's a passing remark but it

16 certainly speaks to his dangerousness in this witness's view as

17 to whether he should be detained. And if you'd would like us to

18 approach --

19          **MR. MEETZE:**  Judge, we'll need the witness to be in

20 the courtroom if he's going to give that person's opinion as to

21 this -- as to this defendant. I don't have any of that

22 information.

23          **MR. DANIELS:**  Hearsay, we believe, is appropriate in

24 this courtroom, Your Honor, given the procedure, this hearing

25 in particular, in a detention and preliminary hearing, I do

Patricia Norden - Direct Examination by Mr. Daniels                57

1  believe we could offer hearsay through the case agent. If
2  Your Honor doesn't want to hear about that witness and his view
3  as to his dangerousness, we can -- you can let us know.

4          **THE COURT:**  I think what Mr. Meetze is saying is he's
5  identified as Witness 1. And if you're going to present hearsay
6  testimony as to, I'm assuming, the specifics as to dangerous
7  other than just a generalization -- I don't know if that is the
8  case or not -- but in order for him to be able to effectively
9  cross-examine or have the opportunity to, that he's --

10         **MR. DANIELS:**  Your Honor, the government has the
11 information we have, and it's relatively limited. It's the
12 length of time the witness has known the defendant and then
13 whether he believes that the defendant is dangerous and should
14 be detained. We would offer it up to Your Honor. If it is not
15 worth -- I trust Your Honor can give it the weight that it's
16 due. And if defense counsel would like to cross-examine the
17 witness -- the agent on where that information comes from, who
18 the witnesses, I think that is an appropriate line of
19 cross-examination that he can -- he can engage in on cross.

20         **THE COURT:**  Okay.

21         Is the substance of your testimony that you're
22 eliciting from her already, is there more to it?

23         **MR. DANIELS:**  No, Your Honor. It's -- it's relatively
24 limited. There would be -- it would be the basis of his
25 knowledge and his view on his instability and whether he should

Patricia Norden - Direct Examination by Mr. Daniels                    58

1    be detained. It is in the search warrant affidavit. That's all

2    the information the government has on that witness at this

3    time.

4            THE COURT:  Okay.

5            MR. MEETZE:  Same objection, Judge. This will be

6    denying the defendant his right to confront that witness, and

7    we object.

8            THE COURT:  Well, I may can make provisions for that.

9    I mean, if you want to cross-examine him, that is certainly --

10           MR. MEETZE:  I can't. I need to be able to question

11   that person, Judge. I can't cross-examine the agent about what

12   that person says.

13           THE COURT:  I know, but I may can give you an

14   opportunity to at a later time. I might break down court.

15           MR. MEETZE:  That'd be fine, Judge, if we need to.

16           THE COURT:  I mean, if it's necessary.

17           MR. DANIELS:  And maybe we'll get it out on the

18   record and then we can revisit at the end of the hearing if

19   Your Honor would like to convene the hearing for him to conduct

20   a background investigation.

21           THE COURT:  Let me talk to y'all just real quick just

22   to give me an idea of where we're going.

23       (Sidebar conference is held on the record.)

24           THE COURT:  You know, as we all know, these things

25   pop up pretty quickly, you know. I want to give you an

Patricia Norden - Direct Examination by Mr. Daniels                    59

1  opportunity for right of confrontation. (Indiscernible). We

2  operate the best we can.

3          **MR. DANIELS:**  Yeah.

4          **THE COURT:**  Give me an idea.

5          **MR. DANIELS:**  What he is going to say is, "I've known

6  him since high school. This man is unstable and he needs to be

7  detained." That is all we've got. "I've known him since high

8  school, this man is unstable, and he needs to be detained." If

9  Your Honor doesn't think it is worth much --

10          **THE COURT:**  There wasn't any follow-up?

11          **MR. DANIELS:**  No follow up. These are the nature of

12  these tips, particularly in the Capitol riot context. It would

13  generally be "I recognize this person. They participated."

14          **THE COURT:**  Right.

15          **MR. DANIELS:**  And occasionally, the witnesses will

16  say, "Here is my basis or here is what more I know about him,"

17  but we are stuck with the tips that we get. I just don't have

18  more on -- and I actually did ask FBI to find the witness

19  before the hearing to help Your Honor.

20          **THE COURT:**  Right.

21          **MR. DANIELS:**  We haven't been able to do that.

22          **THE COURT:**  (Indiscernible).

23          **MR. DANIELS:**  Okay.

24          **THE COURT:**  Okay.

25  **BY MR. DANIELS:**

Patricia Norden - Direct Examination by Mr. Daniels                    60

1    **Q**    Special Agent Norden, where we left off was January 2021.

2    I'm going to ask you questions about a search of two residences

3    associated with the defendant that came after his arrest, okay.

4    One would be the residence of Vermont and one will be the

5    residence in South Carolina.

6        First, Special Agent Norden, can you tell the Court about

7    the residence in Vermont and how the FBI came to search it?

8    **A**    The FBI received consent to search from the owner of the

9    property.

10   **Q**    And what is that property in Vermont?

11   **A**    It's a trailer.

12   **Q**    Is it a residence that -- what does it have to do with the

13   defendant? Did he used to live there?

14   **A**    That was the defendant's previous address prior to moving

15   down to South Carolina.

16   **Q**    Okay.

17       And you've already testified he moved to South Carolina

18   after the Capitol riots, sometime in the last few months?

19   **A**    Yes.

20   **Q**    And so, in fact, you were able to search the residence

21   where he lived in Vermont at least through the date of the

22   Capitol riots as far you can understand; correct?

23   **A**    Yes.

24       **MR. DANIELS:**  Ms. Welsh, can you pull up Government

25   Exhibit No. 15.

1    BY MR. DANIELS:

2    Q    Tell the Court what you found at the defendant's residence

3    in Vermont.

4    A    The agents that searched that location found a parked

5    truck that looked like it had been used for target practice, a

6    heavy bag hanging off the tree with a target underneath it, and

7    another set of targets out in the wooded area.

8    Q    And generally were you finding evidence of -- what did it

9    appear that was happening at that property before it was

10   apparently abandoned?

11   A    It look like there was some kind of training, I don't know

12   whether it was tactical type of firearms, fighting. Maybe a

13   combination of both going on there from the shot-up car and the

14   heavy bag.

15   Q    Okay.

16   A    Definitely some fighting.

17   Q    And did FBI also find papers associated with the defendant

18   associated with that residence?

19   A    Yes.

20        MR. DANIELS:  I'm going to ask Ms. Welsh to go to

21   Page No. 2.

22   BY MR. DANIELS:

23   Q    You're now looking at Page 2, Government Exhibit No. 15.

24   Start with the top right. Tell the Court about this piece of

25   paper, where it was found, and what's on it.

1  **A**    The top right, the target list.

2  **Q**    Target list, yes.

3  **A**    Target list. Underneath, it says "attack" with some

4  letters, some numbers. I don't know if they're phone numbers.

5  Then it says "breach" or "assault." I don't know if there is

6  some kind of code or what the breach or assault pertains too.

7  No date as to when it is written.

8  **Q**    And were these -- can you tell the Court kind of the

9  context of where these papers were found, what they were found

10  with?

11  **A**    They just seemed to be found on a folding tray in the --

12  in the trailer. The trailer was relatively --

13  **Q**    Were they found together with receipts that had the

14  defendant's name on it?

15  **A**    There were some receipts in the trailer, yes.

16  **Q**    All right.

17       And beyond the target list, attack, breach, assault, can

18  you tell the Court about the second list that says "OBJ" --

19  maybe that's "object" -- Washington? Can you tell the Court

20  about that document was found?

21  **A**    Again, just random writings found on the folding tray.

22  Crystal, diamond, emerald. It talks about Diamond Road waiting

23  point, Emerald breach point, Iron and OBJ again, and cleared.

24  Again, breach, iron, smoke, trench. Nothing that really seems

25  to make much, much sense.

1  Q    Could -- based on your investigation and your experience,

2  these be consistent with tactical training to you?

3         MR. MEETZE:  Judge, we object. This is -- this would

4  be speculation unless there is some other evidence that comes

5  in. They don't appear to know what these things mean.

6         THE COURT:  I would be -- would hear what she has to

7  say. Are you asking her about this or --

8         MR. DANIELS:  Yes.

9  BY MR. DANIELS:

10 Q    Special Agent Norden, let me ask you more directly. Based

11 on your investigation of this case and your experience as an

12 agent, do these two pages appear to be consistent with tactical

13 training?

14        MR. MEETZE:  Judge, this is -- I object to improper

15 bolstering. I mean, this is -- they are trying to take

16 something from the past, some other case, and bootstrap that

17 into this. They don't know what this means.

18        MR. DANIELS:  I would just like the agent to answer

19 the question.

20        THE COURT:  I would give due consideration but I

21 don't know what her response will be.

22        MR. MEETZE:  Let's ask her if she knows what these

23 things mean.

24        THE COURT:  Well, I agree that maybe it was leading.

25 BY MR. DANIELS:

Patricia Norden - Direct Examination by Mr. Daniels                    64

1    **Q**    Special Agent Norden, based on your experience in your

2    investigation as an FBI agent, what do you believe these

3    documents are consistent with?

4    **A**    They could be some kind of training, code for training, if

5    you're, like, working with other units, other people. You don't

6    want them to know what --

7    **Q**    Okay.

8         And to be fair to the defendant, he's been -- I apologize

9    for interrupting you. I thought you were done.

10   **A**    No. Go ahead.

11   **Q**    It's a -- this investigation is ongoing; is that fair?

12   **A**    Yes.

13   **Q**    Okay.

14        Was the house in -- is there anything else you need to

15   offer up to the Court about the residence in Vermont, or no?

16   **A**    There was a receipt for a firearms purchase up there in

17   the defendant's name.

18   **Q**    Okay.

19        And what kind of firearm was on that receipt?

20   **A**    Is that the -- I don't remember which one. I know we found

21   some guns in the home in South Carolina.

22   **Q**    Okay.

23        We will move to the home in South Carolina. When the

24   defendant was arrested last week, was a residence in South

25   Carolina also searched?

1  **A**    Yes.

2  **Q**    And I'll move to Government's Exhibit 16. What was found

3  in that residence?

4  **A**    We found the sweatshirt the defendant was wearing. We

5  found the hat that he was wearing that day. We found the

6  flannel shirt that day, some QAnon, I guess, memorabilia,

7  stickers, coins, some shirts. We found some -- some drugs.

8  **Q**    What kind of drugs did law enforcement find?

9  **A**    We found a bag of weed. We found mushrooms. We found a

10  bong.

11  **Q**    In looking at the top left picture of Exhibit No. 16,

12  what's that book that you have a photo of here?

13  **A**    It is a field guide to mushrooms.

14  **Q**    Okay.

15    And based on where those drugs were found, is there

16  evidence that this information, this property and the narcotics

17  belonged to the defendant or other members of the residence? Do

18  you have an idea yet?

19  **A**    The defendant.

20  **Q**    Okay.

21    Turning to Page 2 of Exhibit 16, tell the Court what

22  they're looking at here.

23  **A**    The photo, the top left where the light is, that's where

24  the guns were found. That is the pullout bed of the defendant.

25  The guns were found within arm's reach, if you were to reach

1    down from the bed. There was 60-round capacity magazine with

2    one in the chamber.

3    **Q**    That's the firearm that was in his bed?

4    **A**    Yes. The firearm's in the bed.

5    **Q**    Okay.

6    **A**    There was a -- to the right, the right photo is the --

7    there appears to be the bong -- well, one of the bongs and a

8    magazine for a handgun, which was not recovered. We didn't find

9    a handgun at the residence. And then the bottom photo is --

10   there's these two large knives that were found under the bed

11   with the guns, as well as a tactical vest, the bag of weed to

12   the right, the green bag there.

13   **Q**    Looking at the tactical vest what is the patch that the

14   Court can see on it?

15   **A**    Q.

16   **Q**    What is that associated with?

17   **A**    QAnon.

18   **Q**    What is QAnon?

19   **A**    QAnon is a group that believes in what's categorized

20   mostly as conspiracy theories. One of the more popular ones is

21   that there is a secret cabal on the government that's running,

22   like, a ring of pedophilia and sex trafficking and that, you

23   know, one day there will be like almost, I guess, like a second

24   coming that will expose all of this. So...

25   **Q**    Okay.

1      And throughout the defendant's house, where was there Q

2  memorabilia on clothing, on his possessions, and other places?

3  **A**    Throughout his room, yeah. We only had the authority

4  really to search his room.

5  **Q**    Okay.

6      Thank you.

7      Looking at the third page, tell the Court what they're

8  looking at with the third page.

9  **A**    These were the weapons that were laid out in the photo

10  beforehand.

11  **Q**    Was it that -- the weapon on the top, was that the weapon

12  that was found in his bed?

13  **A**    They were all back in the -- in that bed area from what I

14  remember.

15  **Q**    Okay.

16      Which is the one with the 60-round magazine that was

17  loaded with one chamber?

18  **A**    I think it was one of the top.

19  **Q**    One at the top?

20      Okay.

21      Special Agent Norden, when -- when the government searched

22  the defendant's house, were they also authorized to seize

23  writings and did the FBI do so during the search of his South

24  Carolina house this week?

25  **A**    Yes.

Patricia Norden - Direct Examination by Mr. Daniels                 68

1          **MR. DANIELS:**  I'm going to asked the Court to -- I

2     mean, I apologize -- Ms. Welsh to go to Government's

3     Exhibit No. 18 first, if we could.

4     **BY MR. DANIELS:**

5     **Q**    And tell the Court generally about what was found in

6     writings. First, what is the Court looking at in Exhibit

7     No. 18?

8     **A**    This was a notebook that was found in the defendant's

9     bedroom.

10    **Q**    And generally, what kind of writings are in the notebook?

11    **A**    It covers some of everything. Thoughts just seem to be

12    somewhat free-flowing, I guess if you would call it that, from

13    the defendant on a different subject and different matters.

14    **Q**    And on that first page, does that -- does it say, "This

15    will be a direct reflection of how I strive to live my life"?

16    **A**    Yes.

17    **Q**    All right.

18         I'm going to ask you about a couple of things. Looking at

19    Page 2, what's that last line and what's the significance of

20    that to you as an agent?

21    **A**    "Stay safe, Anons." That, again, shows the belief in the

22    QAnon mindset.

23          **MR. DANIELS:**  Go to Page 3 please, Ms. Welsh.

24    **BY MR. DANIELS:**

25    **Q**    Tell the Court about Nesara, this page, among the other

1  things and what significance, if at all, you see on this page?

2  **A**    Nesara was another conspiracy theory group, pretty much

3  that there was like a series of economic reforms that were

4  signed that were suppressed by the Bush Administration, George

5  W. Bush Administration. Again, there was someone online that

6  would be making these posts and that, you know -- promising

7  that the day will come, the day will come, the day is coming.

8  And it never does.

9  **Q**    And as part of that Nesara conspiracy, what is a belief as

10  a part of that about 9/11?

11  **A**    That -- that that was why that 9/11 was occurring, to kind

12  of suppress those reforms and that -- that news and the

13  announcement of what was supposed to come. 9/11 happened to

14  suppress whatever was supposed to come from this conspiracy

15  theory.

16  **Q**    Is a part of that conspiracy that 9/11 was an inside job?

17  **A**    Yes.

18  **Q**    All right.

19      Turn to Page  -- actually, I won't turn to that page given

20  the Court's direction about protecting the identity of persons

21  who are not parties in this case. But pages four, five, and

22  six, I'll just direct you there without having Ms. Welsh go

23  there. There's something called a mailing list. Could you tell

24  the Court about a mailing list without putting them up on the

25  screen? Tell the Court what's on those pages please.

Patricia Norden - Direct Examination by Mr. Daniels                    70

1    **A**    It was names, e-mail addresses, some had phone numbers

2    referencing -- some of them referenced like telegram, other

3    secure communication apps. It would appear that -- it would

4    seem almost like an address book for people.

5    **Q**    So there was a list of -- a mailing list. Do you know how

6    many names were on that list?

7    **A**    I would say it covered about three pages. Maybe between 30

8    to 40, I would say about.

9    **Q**    And you've already testified that telegram had a part to

10   do with that list. Did you also see something to do with

11   ProtonMail on that list?

12   **A**    Yes.

13   **Q**    In your experience -- I apologize. In your experience what

14   is telegram and ProtonMail -- what's the significance of that,

15   as a case agent, to you?

16   **A**    Those are encrypted communications. So they're a little

17   harder to subpoena or serve search warrants on to get content.

18   **Q**    There were a couple of references to a particular lawyer

19   named Sidney Powell in that journal. Did that have any

20   significance to you as to -- as to when these journals might

21   have been written?

22   **A**    Sidney Powell came into, I guess, be more prominent with

23   the Michael Flynn case. She, toward the end of Flynn's fight,

24   became his attorney. And she saw that in combination with after

25   the election, she was the one promoting the Dominion fraud, all

1  of the election fraud and that it will come out, it will come

2  out. So she kind of came into prominence around the time of the

3  election.

4  **Q**    Okay.

5      Turning to Page 9. There is a name of a federal prosecutor

6  in Vermont.

7          **MR. DANIELS:**  You can turn to Page 9. Sorry, Brittni.

8  **BY MR. DANIELS:**

9  **Q**    Turning to Page 9, tell the Court what it's looking at, at

10  the bottom of this page with respect to a federal prosecutor in

11  Vermont and a criminal case that's referenced in the

12  defendant's journal?

13  **A**    U.S. Attorney Christina Nolan. She was the U.S. attorney

14  in Vermont that was appointed by, I believe it was Trump or she

15  was acting during his time at least. This case again focused on

16  child porn. The subject of that case had paid a person in a

17  South American country to kidnap, torture, rape, and kill

18  another person, a victim, for the purposes of videotaping them

19  so that the subject of that case could please himself watching

20  the video of it. The subject sent a list of what was to be done

21  to the victim. And they recorded it and received their money.

22  Subject also paid this person to produce child porn to give

23  back.

24      Part of it, the subject had a sadistic sexual sadist

25  nature in that the children were also to be tortured and beaten

Patricia Norden - Direct Examination by Mr. Daniels                    72

1    to the point where they passed out, and raped. And in receiving

2    those videos, again, subject would use them to please himself.

3    It became a murder-for-hire case when they realized that he was

4    paying someone else to have these videos produced for him after

5    it was initially started as a child porn case. And they ended

6    up arresting the person in South America that was paid to

7    produce the videos.

8         Again, it was a shock because it turned out that the

9    person that was producing the videos was a female. So they

10   ended up arresting the person down there. So it had been

11   sealed. The arrest of the initial subject had been sealed until

12   they got the person producing the videos in South America in

13   custody as well.

14            **MR. DANIELS:**  Ms. Welsh, if you can turn to Page 15.

15   **BY MR. DANIELS:**

16   **Q**    There's a reference to a D.C. court in here. If you can

17   tell the Judge --

18            **MR. DANIELS:**  It's going to be this one here.

19   **BY MR. DANIELS:**

20   **Q**    Tell the Court what they're looking at. What is -- what

21   does the journal on Page 15 read about the D.C. court?

22   **A**    Swampy D.C. court, George Washington collection calls to

23   violence, Capitol officers court cases.

24   **Q**    These are reference --

25   **A**    Kennedy, Blackwater, Erik Prince -- Prince was the formal

1    owner of Blackwater during the Iraq war.

2    Q    There are a number of references to Buffalo guy and Jake

3    Angeli in this journal. Who is that, and what's the

4    significance of that person?

5    A    Jake Angeli is known as the "QAnon shaman" who was

6    arrested in the Capitol riots inside the building with the

7    horns, the pelts, the tattoos. So he was -- seen mostly in

8    protests in Arizona prior to the Capitol riots. But again,

9    pretty vocal. Seemed kind of as a leader of it, of the QAnon

10   movement. He is currently being detained as well for his

11   actions that day.

12   Q    Did the government also seize with the authority of this

13   court a cellular phone associated with the defendant?

14   A    Yes.

15   Q    And has FBI conducted a preliminary review of that phone?

16   A    So far, yes.

17   Q    Yes. Initial review?

18   A    Initial, quick cursory review for now, yes.

19         **MR. DANIELS:**  Ms. Welsh, if you can turn to

20   Government's Exhibit 17.

21   **BY MR. DANIELS:**

22   Q    Special Agent Norden, tell the Court generally what was

23   found on Mr. Languerand's device that may be relevant to this

24   case.

25   A    In the notes section of his phone, March 25, he wrote a

1    poem, "Dear FBI, if you play nice, so will I. If you shoot my

2    dog, we all will die."

3         He also writes January 10, four days after, that he doubts

4    forced entry charges will hold up for anybody. "Wait until they

5    prove that the police were letting people in. There goes your

6    court case. If you're okay with fraudulently certifying an

7    election to win, then I'm okay with attacking the government

8    building to stop you." He also says that "the FBI should really

9    find a better hobby than intimidating and persecuting patriots

10   who stood up for their constitutional rights and against the

11   seditious infiltration of the psychopathic criminal mafia into

12   the government that they have sworn an oath to protect." So

13   again, you know, saying -- he ends it with, "Where we go one,

14   we all go," which is the QAnon mantra.

15   Q    And that was on April 9, 2021; is that correct?

16   A    Yes.

17   Q    Turning to Page 2, tell the Court what you found on his

18   device on Page 2?

19   A    This appears from what I could tell to be from the -- the

20   top photo seems to be from the trailer up in Vermont. Heavy bag

21   from that tree that we saw earlier that was behind him. There

22   is one of the long guns. It says, "Life has many doors, fed

23   boy."

24   Q    What's the significance of "fed boy" to you?

25   A    That would appear to be talking about federal agents.

1    **Q**    Federal agents?

2    **A**    Federal law enforcement.

3    **Q**    Okay.

4    **A**    "We have been trained and prepared for this moment." You

5    know, he was talking about 17 community or trained sleeper

6    agents. Although they haven't been active yet -- activated yet

7    they are about be activated."

8    **Q**    Did you say "we" are about to be activated? It says "we."

9    "We" are about to be activated?

10    **A**    "Not been activated yet but you are about to be

11    activated."

12    **Q**    Okay.

13    **A**    "This is not a game, the great awakening. No one can stop

14    what is coming." Again, part of the QAnon is that a storm is

15    coming, something's coming. There always seem to be something

16    coming down the road that never quite -- never quite know what

17    it is or when it is. "Seventeen and signs. All I see is 17

18    signs." Again, another significant number.

19    **Q**    Turning to Page 3 please. Tell the Court about the last

20    line of the first photo and then in the fourth photo about the

21    date -- the statement that is in that image?

22    **A**    Which one? The first photo?

23    **Q**    Yeah. If you're looking at the first photo?

24    **A**    "Make no mistake about it, a lot of people are going to

25    jail, a lot."

Patricia Norden - Direct Examination by Mr. Daniels                76

1  **Q**    Look at these photos. What's the significance of these to

2  you? This one in the fourth photo, as well.

3  **A**    Again, he's directing people to the bottom photo. All my

4  friends. This is about a week after the Capitol riot. He says

5  he's on Gab, another social media app. He says he's far from

6  out of the fight. So it looks like he's still continuing or

7  willing to continue the fight from the 6th. "In fact, you can

8  say I just hit a massive turning stone. Thanks, Jake Angeli" --

9  who we discussed earlier is the QAnon shaman -- "and all of the

10  other wonderful patriots out there that helped get me to this

11  point. I am forever grateful." At the bottom,

12  @blessthisimmunity_17, which we know to be his Instagram and

13  Reddit handle. So --

14  **Q**    What about that one, two, three, zero, boom, boom, boom

15  image? Is that an image you commonly saw in different places

16  associated with the defendant?

17  **A**    We saw it in his notebook, as well as handwritten

18  notebook.

19  **Q**    Okay.

20      Is that --

21  **A**    The photo to the right of top again the guns with his

22  passport in the corner there ---

23  **Q**    All right.

24  **A**    --- and the handgun that, again, we did not recover at the

25  house. But it looks -- it appears that those are the three guns

Patricia Norden - Direct Examination by Mr. Daniels                    77

1    that we did find, the long guns.

2    **Q**    All right.

3        And looking at Page 4, tell the Court about the

4    significance of these photos?

5    **A**    Again, it looks like the subject doing drugs in the first

6    photo. The bottom left photo looks like the photo from the

7    page before actually. To the top right, there is the brass

8    knuckles, other guns, knives. "To the -- for the Masons there

9    sniffing my -- well -- right now, this is your warning, do not

10   eff with me." And then he says "LMFAO, what if I actually just

11   shot myself in the head." That was February 19.

12   **Q**    Turning to Page 5, tell the Court about the significance

13   of these photos?

14   **A**    These are the photos taken of himself with the -- the long

15   guns and the Guy Fawkes mask. He's wearing that same sweatshirt

16   at the Capitol riots to the top left there. It looks like on

17   the seat of a car, dated March 7, 2020, some pretty long knives

18   there. And then, again, the bottom photo, he's got the hat and

19   the face covering that we recovered from the house from the

20   riots on the sixth. He's holding a flag. United States and

21   encore. Again, reference to QAnon, and the frog is a QAnon

22   symbol as well.

23   **Q**    What about Page 6? What's the significance of these photos

24   for the Court?

25   **A**    The one to the upper left, he's "where we go one," and it

1    kind of cuts out. It probably says "we go all." Another queue

2    for the QAnon. To the upper right is the symbol for the Three

3    Percenters.

4    **Q**    Who are the Three Percenters? Who are the Three

5    Percenters?

6    **A**    The Three Percenters are another militia group in the

7    United States that were believed to have taken part in

8    January 6.

9         The bottom is a photo of the Proud Boys. You can see the

10    insignia on the vest with the hat to the left that -- I believe

11    look like Enrique Tarrio -- Enrique Tarrio, the leader of the

12    Proud Boys. Looks like they were at a rally. That doesn't look

13    like January 6 because we know Tarrio wasn't at the rally and

14    they were not wearing Proud Boy gear that day so they could

15    blend in better, admittedly. But that was a photo found on his

16    phone as well.

17    **Q**    So that's QAnon, Three Percenters, and the Proud Boys

18    there?

19    **A**    Yes.

20    **Q**    And what about Page 7?

21    **A**    A couple of white supremacist symbols, the Nazi flag. "The

22    future of our folk is not negotiable." Again, SS, which is

23    associated with Hitler and the Nazis. It looks like that would

24    be an armband more than the flag. The flag looks like it's to

25    the right to the bottom -- I mean, to the left to the bottom

1  right is the armband. Nazi armband.

2  **Q**    And were all of these photos found on the defendant's

3  phone?

4  **A**    Yes.

5  **Q**    Okay.

6      Thank you. Please answer the question that my colleague

7  has.

8                      **CROSS-EXAMINATION**

9  **BY MR. MEETZE:**

10  **Q**    Agent, your testimony is that about 2:20, that that's when

11  both houses of Congress stopped functioning because the members

12  were evacuated at that time?

13  **A**    Around -- yes, they were instructed to evacuate the

14  chambers at approximately that time.

15  **Q**    And people had actually entered the Capitol around 2:10,

16  right before that. Is that what you said?

17  **A**    Yes.

18  **Q**    Okay. So 10 minutes after that approximately, that's when

19  the election certification process stopped; right?

20  **A**    Yes. Yes.

21  **Q**    And the evidence against this defendant, the evidence that

22  you have against this defendant is that he was engaged in

23  particular activity at 5 o'clock that day?

24  **A**    Yes.

25  **Q**    And that's -- you don't have any other evidence that -- of

Patricia Norden - Cross-Examination by Mr. Meetze                    80

1    his activities prior to that time, do you?

2    **A**    Not -- not that I've seen, no.

3    **Q**    So at the time that this defendant is alleged to have done

4    these things that you spoke of, Congress had already been

5    stopped for over two hours?

6    **A**    Yes.

7    **Q**    And the fact that members of Congress had been evaluated

8    and all of this -- all these things that were happening,

9    that -- that was broadcast by the news and on social media and

10   everything like that; right?

11   **A**    I'm not sure what time that was out in the news. I don't

12   know that they would have known that or had access to the news

13   when they -- when they got there. I don't know if he knew that

14   then.

15   **Q**    Did you watch it live on the news?

16   **A**    I was working. I saw bits and -- bits and pieces.

17   **Q**    Okay.

18   **A**    We usually try to keep the sound down. So by the time we

19   saw the screen and turned it up, I don't know what the

20   defendant would have had access to as far as if he would have

21   known that people were evacuated.

22   **Q**    Well, you can see people in the video there with their

23   cell phones and taking films and all of that stuff; right?

24   **A**    Yes.

25   **Q**    And I'm sure you reviewed other -- other video where the

Patricia Norden - Cross-Examination by Mr. Meetze                81

1  President sent out a message that Mike Pence didn't have the

2  courage to take certain action; right?

3  **A**   Yes.

4  **Q**   That seems to have been known by the people that were

5  there at the Capitol, wasn't it? You know that to be true,

6  don't you?

7         **MR. DANIELS:**  Objection. It's speculative,

8  Your Honor. He's asked that question, and she doesn't know.

9         **MR. MEETZE:**  She hasn't answered it yet.

10        **MR. DANIELS:**  He is asking her to -- what was in the

11 mind of the members of the riot at the riot. Certainly

12 speculative, Your Honor.

13        **MR. MEETZE:**  That's not what asked her, Judge.

14        **THE COURT:**  That's not the question asked.

15        Ask your question again.

16 BY MR. MEETZE:

17 **Q**   Are you aware personally that the President sent out a

18 message on Twitter or social media that Mike Pence didn't have

19 the courage to essentially decertify the election; right?

20 **A**   I had heard news that he had thought that. I didn't

21 actually see the tweet myself but --

22 **Q**   You are not aware that the President sent that message?

23 **A**   Well, I am aware, but I did not physically see -- see it.

24 I heard it on the news, yes.

25 **Q**   As part of your investigation into the -- this whole

Patricia Norden - Cross-Examination by Mr. Meetze                82

1    event, you are not aware of that?

2    **A**    I said I was aware of that, yes.

3    **Q**    And you are also aware, as part of your investigation,

4    that people who were there at the Capitol knew that because

5    they knew about it on social media; right?

6             **MR. DANIELS:**  Objection, Your Honor; speculative.

7             **THE COURT:**  You know, people or this defendant?

8             **MR. MEETZE:**  I'll just move on, Judge.

9             **THE WITNESS:**  Yeah. I don't know what the defendant

10   knew.

11            **MR. MEETZE:**  Can we play the video again? The one --

12   the alleged -- the one that was throwing the objects.

13        (Exhibit is played at 4:43 p.m.)

14        (Exhibit is stopped at 4:43 p.m.)

15   **BY MR. MEETZE:**

16   **Q**    All right.

17        You testified earlier that this defendant was up at the

18   very front of this by the police on the front line of this. Was

19   that an example of when that occurred when he threw the plastic

20   cone?

21   **A**    He was toward the front then. My testimony was when he was

22   in possession of the shield, he was at the front. He is not in

23   possession of the shield here.

24   **Q**    So your testimony is that the only time he was at the

25   front of the line like next to the police officers was when he

1   had the shield?

2   **A**   I -- I mean, I would view it again to see if he was up,

3   but he's clearly up close to the front. There are people with

4   the shields in front of him. But he throws the object over all

5   of them.

6   **Q**   Isn't it true that for the most part he is not at the

7   front of this, there are other people ahead of him that are

8   interacting with the law enforcement officers; right?

9   **A**   Right.

10  **Q**   And he's clearly -- he threw the cone in there and some

11  other objects, but is he the -- he's not the one that's got a

12  baseball bat beating on the police, is he? And he's not the

13  person who has got a flag pole that's there beating on the

14  police shields, is he?

15  **A**   No.

16  **Q**   You see the person in the video with the skateboard?

17  **A**   (No audible response.)

18  **Q**   It may not be in this still picture. But have you noticed

19  the guy with the skateboard?

20  **A**   I --

21          **MR. MEETZE:**   Keep playing.

22      (Exhibit is played at 4:45 p.m.)

23      (Exhibit is stopped at 4:46 p.m.)

24  **BY MR. MEETZE:**

25  **Q**   You see the guy with the skateboard?

Patricia Norden - Cross-Examination by Mr. Meetze                    84

1   **A**    Yes.

2   **Q**    Do you know who that defendant is or has that person been

3   charged?

4   **A**    I don't know.

5   **Q**    Okay.

6          Do you know who Grady Owens is?

7   **A**    Who who?

8   **Q**    Do you know who Grady Owens is?

9   **A**    No.

10  **Q**    Okay.

11          **MR. MEETZE:**  Keep -- keep playing.

12          (Exhibit is played at 4:46 p.m.)

13          (Exhibit is stopped at 4:46 p.m.)

14  **Q**    All right.

15          So on that part of the video, you've got somebody that's

16  trying to hit the officers point blank with an object, somebody

17  else that's beating on the shield of an officer with a white

18  flagpole and somebody else that's got a baseball bat beating on

19  the shield; right?

20  **A**    Yes.

21  **Q**    And this defendant's conduct, at best, seems to have been

22  that he logged a few objects over the top of the barricade,

23  isn't that fair?

24  **A**    (No audible response.)

25  **Q**    He just logged the objects over the police with the

Patricia Norden - Cross-Examination by Mr. Meetze                    85

1   shields?

2   **A**    But that orange traffic barrier that he logged is pretty

3   heavy. There had been other people in other videos that I saw

4   that weren't submitted that they had tried to toss it and they

5   were not able to get the loft or the distance that the

6   defendant was. So an item that with the weight of that would do

7   damage.

8   **Q**    Well, there are other angles of this, aren't there, like

9   on the FBI website?

10  **A**    Yeah.

11  **Q**    Doesn't the cone itself mainly fly over to the right and

12  go over their heads for the most part?

13  **A**    Well, I mean, you're going rows back with the officers.

14  While it goes over the initial line, there's rows of officers

15  behind them.

16  **Q**    Are you aware of the complaint filed in the District of

17  Columbia where of the -- these individuals hit an officer in

18  the head with a skateboard and gave him a concussion?

19  **A**    I don't know of every complaint that was filed about this,

20  no.

21  **Q**    Okay.

22          **MR. DANIELS:**  Your Honor --

23  **BY MR. MEETZE:**

24  **Q**    Do you have any evidence, any specific evidence that any

25  object that this defendant may have thrown injured any of these

1  officers?

2  **A**    Like did they file a -- I really don't know.

3  **Q**    Like did Officer -- did Officer Johnson say, "I got hit in

4  the head with this plastic traffic cone and it hit me or it cut

5  me?"  Is there any evidence that anything that he threw

6  actually injured any of these officers?

7  **A**    Not that I'm aware of.

8  **Q**    And isn't it also true that this defendant didn't --

9  didn't take the shield from the officer that that man in the

10  gray camo there is the one who took the shield?

11  **A**    You see him pick it up, yeah. I don't know that he ripped

12  it from the possession of the officer.

13  **Q**    Yeah. He didn't physically take it from the officers, did

14  he.

15  **A**    No, it didn't look like it.

16  **Q**    He sort of got the shield from the guy in the gray camo

17  shirt?

18  **A**    He got -- he did get it from somewhere else, yes. I don't

19  remember specifically who.

20  **Q**    He, at most, is hitting the shield on the ground; right?

21  **A**    Right.

22  **Q**    He didn't hit an officer with the shield?

23  **A**    Not that I saw in the video -- in this video.

24  **Q**    And you say that he was chanting. Can you hear him on the

25  tape making some chats?

Patricia Norden - Cross-Examination by Mr. Meetze                87

1   **A**    You could see that -- there was another video from a

2   different angle where you can see mouth moving. I don't know

3   what specifically --

4   **Q**    There was no audio of anything he said, is there?

5   **A**    Not that I can see from this one, no.

6   **Q**    And you can't tell that he's saying anything on this

7   video; right?

8   **A**    No.

9   **Q**    There -- you don't -- there is -- do you have any evidence

10  that this defendant -- that this defendant physically touched

11  or put his hands on any officer in any way on that day?

12  **A**    Physically, no, other than the objects thrown.

13  **Q**    The picture that is described as being a selfie, about

14  when was that taken?

15  **A**    That was taken on January 6 timeframe. I don't know the

16  time. It would have to be --

17  **Q**    Do you know if it was before or after this?

18  **A**    I don't know if it was before or after.

19  **Q**    It was at a different -- was it at a different location?

20  **A**    It looked like the same -- same vantage point. Probably

21  about approximately the same location.

22  **Q**    You're not really sure?

23  **A**    Not right at the front, but --

24  **Q**    It doesn't have this exact view in it?

25  **A**    Can I -- can we see it again so I can --

1    Q    Yeah.

2         **MR. MEETZE:**  The picture of the selfie. I don't know

3    what number it is.

4    BY MR. MEETZE:

5    Q    This picture on the left.

6    A    Uh-huh. It looks like it was from the --

7    Q    Do you know where that is at the Capitol?

8    A    It looks like it was taken from the west side about the

9    same vicinity from what I can -- from what I could gather.

10   Q    You don't know if that's the exact location?

11   A    No. It's a little hard to tell. But it looks like he's got

12   the higher vantage point. I would guess it is about the same

13   location.

14   Q    Okay.

15   A    4:25, so it would look like it was -- unless it is the

16   time from the phone and not the photo.

17   Q    Do we know when that -- if that time on the picture is

18   January 6 or is that the time of day when he might've -- may

19   have posted that on social media?

20   A    Well, the photo is January 6, given the crowd.

21   Q    Well, the time there. Do you know what time that

22   represents for sure?

23   A    No. It could be a time that photo was screen-grabbed.

24   Q    Posted on social media?

25   A    So he posted it and whoever -- you know whoever captured

Patricia Norden - Cross-Examination by Mr. Meetze                89

1    that photo of him, it could be their phone.

2  **Q**    Okay.

3        It doesn't necessarily mean that it's 4:25 on January 6 at

4    the Capitol?

5  **A**    No, it does not.

6  **Q**    Okay.

7        Now as far as the -- the incidents -- the incident reports

8    that you testified about, other than gathering the reports and

9    sort of reading from the reports here today, have you done any

10   independent follow-up to any of those incidents yourself?

11 **A**    No. We just received those reports.

12 **Q**    So any of the people involved that may be mentioned in

13   those, you didn't talk to them?

14 **A**    No.

15 **Q**    As to the defendant not appearing in court, you just know

16   he was not there, you don't know why he wasn't there; right?

17 **A**    Yes, correct.

18 **Q**    Do you have any -- I know that you testified about some

19   pictures, some have members of the Proud Boys in them, a logo

20   of the Three Percenters, a swastika picture or two. Other than

21   those pictures, do you have any evidence that -- that shows

22   that this defendant is a member of the Proud Boys, the Three

23   Percenters, the Oath Keepers, any group like that, or any white

24   supremacy type group?

25 **A**    The investigation is still continuing. We haven't gotten

Patricia Norden - Cross-Examination by Mr. Meetze                    90

1    to fully exploit the contents of the cell phone yet. We don't

2    know.

3    Q    At this time as you sit here?

4    A    At this time.

5    Q    As you sit here?

6    A    Yes.

7    Q    There is no evidence that he is a member.

8    A    Other than the photos that we've recovered on the phone.

9    Q    Is there any evidence that any member of the Proud Boys

10   Three Percenters, Oath Keepers, any of those people contacted

11   this defendant about the January 6 incident?

12   A    Not -- not that I -- I don't know. We haven't -- we are

13   still continuing the investigation. We would have to run the

14   numbers.

15   Q    At this time, there is no evidence of that; right?

16   A    Right.

17   Q    And in this video -- I mean, would it be fair to say that

18   what he's doing there, he's doing on his own?

19   A    He could be. We do know that people had been separated as

20   they went in with the crowd coming in. So he could've just been

21   separated from them.

22   Q    Well, but, you know, it doesn't -- it obviously doesn't

23   appear from the video that he's acting in organized concert

24   with other individuals like members of the Proud Boys or

25   anything like that, right, that he's not carrying out some

Patricia Norden - Cross-Examination by Mr. Meetze                91

1    specific plan?

2    **A**    Well, they were all scattered throughout the crowd. He

3    could have been. That day, they were told not to wear anything

4    identifying.

5    **Q**    But he's not a member as far as you know right now?

6    **A**    Not that -- I don't know.

7    **Q**    And he's -- he's clearly not the one engaged in the worse

8    conduct right there; right?

9    **A**    I would -- I don't know. In this photo? He's throwing

10    something at that point.

11    **Q**    You think logging a small can is just as bad as smashing

12    somebody with a skateboard or hitting on the shield with a

13    baseball bat?

14    **A**    All depends on what's in the can. If it was pepper spray

15    and it deployed when it got behind the line, it could be as

16    bad.

17    **Q**    Isn't someone else in the crowd later on in the video

18    actually spraying the police with some kind of substance?

19    **A**    Yeah. The police were spraying as well. So it's hard to

20    tell where it's coming from.

21    **Q**    You can clearly see one of the protesters spraying

22    chemical on the police, can't you?

23    **A**    Yes. I've seen video of that.

24    **Q**    Okay.

25        As far as the defendant's writings that you've recovered,

Patricia Norden - Cross-Examination by Mr. Meetze                    92

1    is there any evidence to indicate that that has been published

2    to anybody else online or sent out to anybody else? Or do those

3    just appear to be his personal writings?

4    **A**    Those appear to be his writings that we know of.

5    **Q**    After the -- the order of protection, that was -- that was

6    entered in January 2019?

7    **A**    Yes.

8    **Q**    And it prohibited him from having a gun for one year?

9    **A**    Yes.

10   **Q**    That expired in January 2020?

11   **A**    Yes.

12   **Q**    So these other incidences that may have referred to him

13   having a gun, that occurred after that; right?

14   **A**    I believe so, yes.

15   **Q**    And this defendant is not prohibited from possessing a

16   firearm, is he?

17   **A**    Not at this time, no.

18   **Q**    And it's not illegal -- the guns that you recovered, the

19   guns by themselves are not illegal, are they?

20   **A**    No. We didn't -- no.

21   **Q**    Those magazines are not illegal, are they?

22   **A**    In South Carolina, I don't think they are. I mean, they

23   weren't -- we didn't take the guns. The guns are still at the

24   residence.

25   **Q**    Well, if somebody wants to have an AR-15 -- that's one of

1    the guns that you found, isn't it?

2    **A**    Yes.

3    **Q**    You can go buy one if you're not prohibited; right?

4    **A**    Right.

5    **Q**    So it's not illegal for him to have these guns?

6    **A**    No. But as far as -- like in New York, there are

7    high-capacity magazines -- like New York, where I am from,

8    limits the amount of bullets you are allowed to put in a

9    magazine. So that's the thing that I would -- not sure if South

10   Carolina if there is a difference.

11   **Q**    He's not charged with that here, is he?

12   **A**    No. That's why -- that's why when you asked me, that was

13   just my thought process going through.

14   **Q**    As to the incident with -- the gun pointing incident

15   involving the juvenile, he told the police that day that he

16   regretted that it happened, didn't he? At the end of the

17   report --

18   **A**    When he found out they were juveniles, yes, he was sorry

19   the incident occurred.

20   **Q**    Right. That's what he told the police?

21   **A**    Right.

22   **Q**    Now if somebody is classified as a pedophile, that means

23   that they are sexually attracted to children and young children

24   rather than adults; right?

25   **A**    Correct.

Patricia Norden - Cross-Examination by Mr. Meetze                    94

1  **Q**    And pedophiles can be known to engage in sexual abuse of

2  children; right?

3  **A**    Yes.

4  **Q**    And that's illegal?

5  **A**    Yes.

6  **Q**    So it's -- there's -- there's really nothing wrong with

7  being opposed to the sexual abuse of children, is there?

8  **A**    No.

9  **Q**    I mean, most people would think that that's terrible;

10 right?

11 **A**    Right.

12 **Q**    And isn't it true that the FBI has on its website, I

13 guess, certain symbols that do represent child sexual abuse and

14 pedophilia?

15 **A**    Yes. There is a website for --

16 **Q**    And isn't that part of what this defendant told law

17 enforcement that these are what the symbols are? They might

18 have told him, "No, these aren't the same symbols that you're

19 talking about," but isn't that what he said?

20 **A**    That's what the defendant believed, I think, yes, that

21 that's what those symbols were.

22 **Q**    So he -- so really, these incidents, he was just speaking

23 out against illegal activity that he was personally against;

24 right?

25 **A**    The people that reported them felt threatened by him. It

1  wasn't just appear to be a conversation. Accusing -- yeah,

2  telling the one guy that he knows who he is, he's watching him

3  is a little threatening.

4  **Q**    That was the -- that was the essence of his complaint

5  though, right, that he is against child sexual abuse and

6  pedophilia; right?

7  **A**    The defendant is, but the person who filed the complaint

8  felt threatened by the defendant for approaching him and

9  telling him that he knows what he looks like, he's going to be

10 watching him. So I mean it's one thing to be against

11 pedophilia; it's another thing to threaten someone because you

12 feel like they painted symbols that could be associated with it

13 and tell them you're watching them.

14        **MR. MEETZE:**  Just one second please, Your Honor.

15        **THE COURT:**  Okay.

16     (Pause in proceeding.)

17 **BY MR. MEETZE:**

18 **Q**    As far as you know, he never violated the order of

19 protection, did you?

20 **A**    I do not know.

21     (Pause in proceeding.)

22        **MR. MEETZE:**  No further questions, Your Honor.

23        **THE COURT:**  All right.

24        Mr. Daniels, anything further?

25        **MR. DANIELS:**  Very briefly, Your Honor. Just a couple

Patricia Norden - Redirect Examination by Mr. Daniels                    96

1    of points of clarification.

2                    **REDIRECT EXAMINATION**

3    **BY MR. DANIELS:**

4    **Q**    Special Agent Norden, you're not saying that these

5    officers weren't injured by the officers that he, according to

6    the D.C. Judge, assaulted him with; right? You just don't know?

7    **A**    No. I just don't know.

8    **Q**    In fact, there were thousands of people on the Capitol

9    grounds that day; is that fair?

10   **A**    Yes.

11   **Q**    And you can't say whether they were hurt or whether they

12   were not, because you don't have that information today;

13   correct?

14   **A**    Right. I don't know that they knew the specific objects

15   that they were hit with that hurt them. I don't know who was

16   injured in that tunnel.

17   **Q**    Thank you.

18           Defense counsel's proffer and cross-examination that

19   there's no evidence that his writings have been published. We

20   have not put up on the screen the mailing list of the dozens of

21   names, telegrams, ProtonMails, for the protection of those

22   persons. But on Page 3 of the notebook, in fact, there's a

23   document entitled "Mailing List;" is that correct?

24   **A**    Yes.

25   **Q**    And what appears to be underneath that mailing list? What

Patricia Norden - Redirect Examination by Mr. Daniels                    97

1  kind of topics?

2  **A**    Vaccine, gold standard, Nesara, Chinese military,

3  concentration camps, media exodus -- I guess that one says --

4  military, chain of command, Bible study, Mike Flynn -- AJ and

5  Mike Flynn, Hunter Biden, FBI watch, or which, for -- watch for

6  election, media and election. I can't make out what the last

7  word is.

8  **Q**    That's fine. That's fine. So there is some evidence of at

9  least a mailing list with context to follow; is that fair?

10 **A**    Yes.

11 **Q**    Finally, on cross, you were asked that the essence of his

12 complaints and the repeated law enforcement encounters was his

13 opposition to pedophilia. Was his conduct consistent based on

14 your experience as an agent, your experience in this case with

15 someone who is deeply committed to QAnon, with respect to the

16 pedophilia piece in particular?

17 **A**    Yes.

18 **Q**    Okay.

19 **A**    Yes. I mean, the complaints weren't that the defendant was

20 complaining about pedophilia. The complaints were that people

21 who felt they were being harassed because he was confronting

22 them about pedophilia. And the two instances, the two different

23 pizza shops, they were the actual complainant or victim

24 complaining that the subject was harassing them and saying that

25 they were involved in pedophilia. So it wasn't that -- while he

1   might be against it, he was accusing people that there was

2   no -- based on what seems to be consistent with the QAnon

3   conspiracy theory.

4   **Q**    Okay.

5        And so it was actually the businesses that were having to

6   call the police; is that correct?

7   **A**    Yes.

8   **Q**    And one of those businesses have to develop a safety plan

9   with the police ---

10  **A**    Yes.

11  **Q**    --- with respect to the defendant?

12  **A**    Yes.

13  **Q**    Thank you.

14       No further questions.

15           **MR. MEETZE:**   Judge, I have one other question.

16           **THE COURT:**   Okay.

17                        **RECROSS EXAMINATION**

18  BY MR. MEETZE:

19  **Q**    I know that it may not be on the record here officially,

20  but I know the government has provided other pages of this

21  document, this -- these writings that have some e-mail

22  addresses, this page here that has mailing list. When I asked

23  you is there's any evidence that these writings have been sent

24  out, I meant to refer to have -- did it get mailed out? Did it

25  get e-mailed to these people that are listed in the notes? Or

1   do you not know?

2   **A**     I don't -- we don't know that yet. We are still in the

3   process of exploiting the device.

4   **Q**     Okay.

5        No further questions.

6             **THE COURT:**  Okay.

7             **MR. DANIELS:**  I have nothing further for this

8   witness, Your Honor, but if we could approach.

9             **THE COURT:**  Okay.

10             **MR. DANIELS:**  Thank you.

11        (Sidebar conference is held on the record.)

12             **MR. DANIELS:** On the jail calls, we kind of left it

13   open. I mean, I think that we have a wealth of information

14   about the defendant. You may not need anything more. If you

15   think it's important to hear them, I will do whatever we got to

16   do to make sure that we can look at them. If you don't think

17   that we will need them one way or the other, then --

18             **THE COURT:**  I will leave it up -- up to you. I don't

19   know, to be honest with you, what he thinks, for whatever

20   that's worth.

21             **MR. DANIELS:**  Yeah.

22             **MR. MEETZE:**  Judge, I hate to bring this up.

23             **THE COURT:**  Yeah.

24             **MR. MEETZE:**  If the defendant wants to testify, I'm

25   going to need some time to go over this with him in more

1   detail.

2         THE COURT:  Does he -- does he want to?

3         MR. MEETZE:  I think he might. I may need to ask the

4   Court to adjourn this and let me do that.

5         MR. DANIELS:  I mean, I'm not going to ever oppose a

6   defendant who needs more time. I've never had an objection to

7   one. But I just, to me, it feels like we're all here. He's

8   here. I -- I -- I'd rather get the hearing over with.

9         MR. MEETZE:  I've got a client on video. I can go

10  down the hall and talk to him a little bit.

11        THE COURT:  We -- I mean, I can take a break. I mean,

12  we need to -- what time is it?

13        MR. MEETZE:  5:15.

14        THE COURT:  I mean, we need to -- how long do you

15  anticipate?

16        MR. MEETZE:  I don't know how long it's going to

17  take.

18        THE COURT:  Do you have any other witnesses?

19        MR. DANIELS:  We're done.

20        THE COURT:  You're going to rest?

21        MR. DANIELS:  Yeah, we're done.

22        THE COURT:  Why don't we do this: Why don't we take a

23  10-minute recess and you can talk to him?

24        MR. MEETZE:  Okay.

25        THE COURT:  And if he's not testifying then --

1          **MR. MEETZE:**  That will be fine.

2          **THE COURT:**  Is there any more evidence to be put on?

3          **MR. MEETZE:**  The only other -- Judge, I've got his

4     grandmother here, and boss. I know they would like to say a few

5     things.

6          **THE COURT:**  Yeah.

7          **MR. MEETZE:**  You know, whether or not you want them

8     to take the stand or not, we just need to know if they can

9     speak or if they have to testify. That's all I have, and then

10    I'm going to make my argument at the end, you know.

11         **THE COURT:**  Well, I think we need to do that. And we

12    can conclude today. If he's going to testify --

13         **MR. DANIELS:**  That will mean we might have to come

14    back.

15         **THE COURT:**  Probably come back in the morning.

16         **MR. DANIELS:** I have Judge Currie tomorrow, but one of

17    us will be -- we'll make it work. Yeah. I'll be fine. I've got

18    court at two tomorrow. So I'm fine tomorrow.

19         **THE COURT:**  Tomorrow?

20         **MR. DANIELS:**  Tomorrow, yeah.

21         **THE COURT:**  I'll have to go over all the Fifth

22    Amendment --

23         **MR. MEETZE:**  I can't hear you.

24         **THE COURT:**  I have to go over all the Fifth Amendment

25    stuff with him.

1          **MR. DANIELS:**  The only thing I might have mentioned

2     to you is that because the weight of the evidence is factored

3     in a detention hearing, I have --

4          **THE COURT:**  Let's just break.

5          **MR. MEETZE:**  I'll talk to him. I can find out if he

6     is going to testify or not in 10 minutes. But I don't think I

7     can get prepared and put him up in 10 minutes. I can come back

8     in 10. Assuming we can get the call to the jail going.

9          **THE COURT:**  Yeah.

10         **MR. MEETZE:**  They can't make everybody leave and let

11    me talk to him.

12         **THE COURT:**  I'll just recess for 10 minutes and we'll

13    resume. At least we will know that's where we're going.

14         **MR. DANIELS:**  Thank you.

15       (Sidebar conference is concluded.)

16         **THE COURT:**  Mr. Languerand, is there an officer close

17    by?

18         **THE DEFENDANT:**  I believe that there is, Your Honor.

19         **THE COURT:**  Can you get their attention ---

20         **THE DEFENDANT:**  Yes, Your Honor.

21         **THE COURT:**  --- please.

22         **THE MARSHAL:** Yes, Your Honor.

23         **THE COURT:**  Hey, his attorney wants to talk to him.

24    Do you have -- do you have Mr. Meetze's cell phone?

25         **THE MARSHAL:**  I am sure I can grab it. One second.

1          **THE COURT:**  Okay.

2          I'm going to breakdown court for just about 10

3    minutes.

4          **MR. MEETZE:**  Judge, it needs to be the number that

5    the clients use to call us, I think.

6          **THE COURT:**  Okay.

7          There is a number that -- do you have it?

8          All right.

9          Can you give him access to a cell phone or to a

10   phone?

11         **MR. MEETZE:**  I've got to go downstairs where my phone

12   is.

13         **THE COURT:**  Mr. Languerand, do you have it in your

14   pocket? Do you have the number to call Mr. Meetze?

15         **THE DEFENDANT:**  I have it in my cell, Your Honor.

16         **MR. MEETZE:**  I got -- my phone is downstairs.

17         **THE COURT:**  He has got to go to his phone downstairs.

18         Mr. Meetze, do you know what number to call?

19         **MR. MEETZE:**  I don't remember it. It is 799. I can't

20   remember the other numbers.

21         **THE COURT:**  Well, before you go anywhere... (Pause.)

22         Is there a number that Mr. Meetze can call?

23         **THE DEFENDANT:**  Your Honor, the phone number that is

24   on this phone here says (843) 915-8747.

25         **MR. MEETZE:**  Repeat that?

1        **THE DEFENDANT:** It's (843) 915-8747.

2        **MR. MEETZE:** I'll go try that.

3        **THE COURT:** Okay.

4        If that doesn't work, we can try another one.

5        All right.

6        We're going to take about a 10-minute recess. Then

7    we'll go from there.

8        **MR. DANIELS:** Your Honor, can we excuse the witness

9    from the stand?

10        **THE COURT:** Sir?

11        **MR. DANIELS:** Excuse me, Judge. If we could excuse

12    the witness from the stand.

13        **THE COURT:** Yeah. There's no more questions for you.

14    Thank you.

15        **MR. DANIELS:** Thank you, Judge.

16        (The Court goes off the record at 5:16 p.m.)

17        (The Court goes on the record at 5:30 p.m.)

18        **THE COURT:** Okay.

19        Mr. Daniels, your agent has completed her testimony.

20    Any further evidence from the government?

21        **MR. DANIELS:** No, Your Honor, not from the

22    government.

23        **THE COURT:** All right.

24        The government rests.

25        Mr. Meetze, any evidence from the defendant?

1          **MR. MEETZE:**  The defendant would like to testify,

2     Judge.

3          **THE COURT:**  Okay.

4          All right.

5          **MR. MEETZE:**  Judge, I've already been over with the

6     defendant his right to testify or not testify and all of those

7     things. He says he understands. I'm going to need some time to

8     discuss his testimony with him before he actually takes the

9     stand though, Judge.

10          **THE COURT:**  All right.

11          How long do you think that his testimony might last?

12          **MR. MEETZE:**  It will probably last 30 minutes. That's

13     my best estimate.

14          **THE COURT:**  Mr. Languerand, you've got a right to

15     testify under the Fifth Amendment. You can't be forced to

16     testify.

17          **THE DEFENDANT:**  I'm sorry, Judge. I can't hear you.

18          **THE COURT:**  Okay.

19          Under the Fifth Amendment, you have -- you have

20     protections. You don't have to -- you know, against

21     self-incrimination. In order to testify, that would require

22     that you do a knowing and voluntary plea waiver of your rights

23     under the Fifth Amendment. And I'm sure that Mr. Meetze has

24     gone over those rights with you.

25          This case is pending, as you know, in the District of

1   Columbia, and this is not a trial. This is a Rule 5 hearing

2   which refers us to the preliminary hearing which you have a

3   right to (Indiscernible) indictment and complaint out of the

4   District of Columbia.

5          So you know, generally, it may not be a great idea to

6   testify at a preliminary proceeding like this. Understand, it's

7   your choice. You've got the right -- you certainly have the

8   right to testify and the right to waive your rights under the

9   Fifth Amendment, which again needs to be a knowing and

10  voluntary waiver.

11         I'm not sure we're going to have time. I'm sure the

12  government is going to want to cross-examine you. Mr. Meetze

13  will have the opportunity to question you, and then the

14  government will have the right to cross-examine you. They may

15  have the right to go into matters that you may or may not

16  expect. I just say that in a preliminary way.

17         You know, we -- we can reconvene in the morning at,

18  like, 9:30. I'm actually supposed to be on a conference call.

19  We'll just have to move forward at 9:30 in the morning. Does

20  that pose any problem for anybody?

21         **MR. DANIELS:**  Not for the government. We can be here.

22         **MR. MEETZE:**  Judge, the only problem that I -- I can

23  foresee is that I don't know if I can line up a -- I may have

24  to go to the jail tonight, I guess, and talk to him. I don't

25  know if I can line up a telephone call with him for that early.

1    I don't know if he can be bought over here this -- this early.

2          **THE DEFENDANT:**  Your Honor, I will -- I will waive

3    that testimony then. I've heard it from enough people.

4          **THE COURT:**  Okay.

5          Mr. Languerand, I want you to do that with the

6    advice -- and I just say that -- I don't want to encourage or

7    discourage you necessarily, but I do want you to -- I just said

8    that so you and Mr. Meetze would have the opportunity to talk.

9    It is important for you to know that this is not a trial. This

10   is a preliminary hearing and a bond hearing. And you need to

11   understand the government would have the right to

12   cross-examine. And so it's a -- you know, serious decision you

13   need to make at that point with the advice of counsel.

14         But you want to talk to Mr. Meetze again before

15   you -- you know, I may conclude this hearing this afternoon if

16   you're not going to testify. But again, you want me to give you

17   an opportunity to talk to Mr. Meetze again and let me know?

18         **THE DEFENDANT:**  No, Your Honor. I've -- I've -- I've

19   had several people now recommend that I don't testify at this

20   hearing.

21         **THE COURT:**  Well, I don't -- you know, anything you

22   say can be used against you. I don't want you to go into

23   attorney-client conversation status with Mr. Meetze.

24         Mr. Meetze is obviously not the attorney who is going

25   to be representing you in the District of Columbia. He is

1    representing you for purpose of these proceedings here. Okay?

2          Why don't we do that? I would feel more comfortable

3    if you talk with Mr. Meetze again. I've got another short --

4    two other short things scheduled that I may move forward with

5    and give you a chance to talk to Mr. Meetze again. And then

6    we'll reconvene this. I may stay here if I can get these other

7    cases before me real quick.

8          So you have a line of communication now?

9          **MR. MEETZE:**  It happened before. I hope I can do it

10   again.

11         **THE COURT:**  Mr. Languerand, will you get the guard

12   again please? Get the officer's attention again.

13         **THE DEFENDANT:**  Yes.

14         **THE MARSHAL:**  Yes, Your Honor.

15         **THE COURT:**  He needs to talk to Mr. Meetze briefly

16   one more time. But I have got two other -- is it with them? Are

17   they there?

18         **THE CLERK:**  No, they are at Darlington. We're going

19   to have to disconnect from him.

20         **THE COURT:**  Will that work okay?

21         **THE CLERK:**  I guess so. I don't see why they can't

22   call back.

23         **THE COURT:**  I have two other matters to hear this

24   afternoon. They are at a different facility.

25         **THE MARSHAL:**  Okay.

1          **THE COURT:**  I do not want to cause y'all problems.

2     But we may bring this hearing to conclusion after their

3     conversation. I'll just know more -- they just need to talk

4     before I make that decision. So we may disconnect for like 10

5     minutes and then reconnect after they talk.

6          **THE DEFENDANT:**  Yes, Your Honor.

7          **THE COURT:**  Okay.

8          **MR. MEETZE:**  Judge, it was helpful for him to be in

9     that room. That's how they found him and I was able to talk to

10    him before.

11         **THE COURT:**  This room?

12         **MR. MEETZE:**  The hearing room because I called -- had

13    to call booking and then I had to go through somebody else. But

14    they were able to get him on the phone because he was in that

15    room.

16         **THE COURT:**  Did you hear that?

17         **THE DEFENDANT:**  I did, Your Honor. I have access to a

18    phone here if the lawyer's phone is available.

19         **THE COURT:**  He's right there. He will be available in

20    two seconds.

21         **MR. MEETZE:**  Can I -- I need to know the number.

22         **THE COURT:**  Again?

23    What number should he call?

24         **THE MARSHAL:**  The lawyer or the defendant?

25         **MR. MEETZE:**  I'll call -- I'll call you if I know the

1   number. Nobody picked up on that number.

2          **THE COURT:**  Is there a way to call that room right

3   there?

4          **THE MARSHAL:**  Give me one second.

5          **THE COURT:**  We're going to try to call that number.

6   What's the number on that phone? Is that a secure line?

7          **THE CLERK:**  Sorry, Judge.

8          **THE COURT:**  I want to make sure nobody would be

9   listening to this conversation on that phone.

10         **THE MARSHAL:**  Yes, Your Honor, this is a secure line.

11         **THE COURT:**  Okay.

12         **THE MARSHAL:**  And I'll give the lawyer the number

13  whenever he is available.

14         **THE COURT:**  Okay.

15         All right.

16         Go ahead. He is right here.

17         **THE MARSHAL:**  (843) 915-8747.

18         **MR. MEETZE:**  That's the same number.

19         **THE COURT:**  Hopefully that's the right number to

20  call.

21         **MR. MEETZE:**  Nobody picked up before. I will call it

22  right now.

23         **THE COURT:**  He's going to walk outside the courtroom

24  and call that number right now. I'm going to disconnect from

25  the video teleconference. We'll reassert that after they talk.

1          **THE MARSHAL:**  Yes, Your Honor.

2          **THE COURT:**  Okay.

3          **MR. MEETZE:**  Thank you, Your Honor.

4          **THE COURT:**  All right.

5      (The Court goes off the record at 5:39 p.m.)

6      (The Court goes on the record at 6:08 p.m.)

7          **THE COURT:**  Okay.

8          Can you hear me? I can't hear you.

9          **THE DEFENDANT:**  Yes, I can hear you, Your Honor.

10         **THE COURT:**  There you go.

11         Okay. All right.

12         We're back on the record in United States versus

13     Languerand.

14         Mr. Meetze, we broke down to give y'all an

15     opportunity to have further discussion. Have y'all had a chance

16     to do that?

17         **MR. MEETZE:**  We have discussed that, Judge. We've

18     been through the advantages/disadvantages of that decision. And

19     based on our conversations, he has decided not to testify.

20         **THE COURT:**  Okay.

21         All right.

22         Mr. Languerand, is that correct?

23         **THE DEFENDANT:**  Yes, Your Honor.

24         **THE COURT:**  Okay.

25         Okay.

1          With that said, any further -- any evidence that you

2    want to put up?

3          **MR. MEETZE:**  Judge, his grandmother is here and she'd

4    like to speak to you.

5          **THE COURT:**  Grandmother?

6          **MR. MEETZE:**  Grandmother, yes, sir. And his boss is

7    here. He would like to talk to you. Whether or not you want

8    them to testify, I don't know. But they are here and they would

9    like to speak to you.

10         **THE COURT:**  Mr. Elliott?

11         **MR. DANIELS:**  Yes, Your Honor.

12         **THE COURT:**  Any objection to them just proffering?

13         **MR. DANIELS:**  No, Your Honor, with this caveat, there

14   are two brief lines I'd proffer if his grandmother does wish to

15   speak that does speak to her home being a suitable place for

16   bond. I don't think we need to put an agent up, but I could

17   just proffer up without objection from the defense if he is --

18   just statements that were made by the grandmother to agents on

19   the day of to the extent, Your Honor, we consider whether her

20   home would be an appropriate place for bond.

21         **THE COURT:**  Okay.

22         **MR. DANIELS:**  If Your Honor doesn't need that --

23         **THE COURT:**  Well, I'll give you the opportunity to do

24   what you want to do. I will let them proffer. And if you want

25   to -- for some reason need to ask her some questions, I can

1  give you the opportunity to do that or I could give you the

2  opportunity for traditional testimony ---

3  　　　　　**MR. DANIELS:**  Okay.

4  　　　　　**THE COURT:**  --- or proffer, depending on what

5  Mr. Meetze says.

6  　　　　　**MR. DANIELS:**  Thank you, Your Honor.

7  　　　　　**MR. MEETZE:**  May I discuss that with them, Judge?

8  　　　　　**THE COURT:**  Yeah. Sure.

9  　　　(Pause in proceeding.)

10  　　　　　**MR. MEETZE:**  His boss is over here, Judge. I got to

11  go speak to him.

12  　　　　　**THE COURT:**  Okay.

13  　　　(Pause in proceeding.)

14  　　　　　**THE COURT:**  Yes, sir?

15  　　　　　**MR. MEETZE:**  Judge, his grandmother, Susan Killian is

16  here. She would like to speak.

17  　　　　　**THE COURT:**  Sure.

18  　　　　　Ma'am, if you would come forward. Just come to the

19  podium.

20  　　　　　**THE SPEAKER:**  Right here?

21  　　　　　**THE COURT:**  Yes, ma'am.

22  　　　　　**THE SPEAKER:**  Nicholas is our grandson, and he is

23  from a broken home since he was a young toddler. He has faith

24  and belief in Jesus Christ. It's very strong. He enjoys the

25  outdoors. He enjoys guitar playing and writing music. That

1   gives him great pleasure. He served in the Army, which you

2   know, in the Airborne Division. And we trust him here in South

3   Carolina. He has given us no problems. We have driven him back

4   and forth to work for the past three months. He is a good

5   person. He is a patriot and loves his country. And that's all I

6   want to say.

7           **THE COURT:**  Okay.

8           **THE SPEAKER:**  Thank you.

9           **THE COURT:**  Thank you, ma'am.

10          **MR. MEETZE:**  His boss, John Chaves, is here. I'm

11  going to tell him to come in now.

12          **THE COURT:**  Okay.

13          Yes, sir.

14          **THE SPEAKER:**  Yes, Your Honor.

15          **THE COURT:**  Can you tell me your name, sir?

16          **THE SPEAKER:**  My name is John Chaves with Chaves --

17  I'm the President of Chaves Enterprises Incorporated ---

18          **THE COURT:**  Okay.

19          Yes, sir.

20          **THE SPEAKER:**  --- out of Conway, South Carolina. I

21  met Nick through employment in January. And he's been a very

22  good employee, very punctual, on the job all the time, very

23  hard worker. You know, he is a good asset to the company. Very

24  conscientious, and he's very thoughtful too.

25          **THE COURT:**  Okay.

1          All right.

2          **MR. MEETZE:**  Judge, this is a business. He's a heavy

3  equipment operator, I believe.

4          **THE SPEAKER:**  Yeah. Nick does a little of everything.

5  He's a good laborer. He's a good operator.

6          **THE COURT:**  What hours a week does he generally work?

7          **THE SPEAKER:**  Seven to four or five o'clock.

8          **THE COURT:**  Five days a week?

9          **THE SPEAKER:**  Yeah. And he's -- he cares about the

10  job, and he cares about the work. He comes in just to help out

11  and organize after-hours and weekends. He's definitely a big

12  help.

13          **THE COURT:**  Okay.

14          Okay.

15          Thank you, sir.

16          **THE SPEAKER:**  Yep. Thank you.

17          **MR. MEETZE:**  Thank you for coming. Appreciate it.

18          **THE COURT:**  All right.

19          Yes, sir, Mr. Daniels?

20          **MR. DANIELS:**  Your Honor, briefly in rebuttal, I can

21  either proffer if the Court and defense counsel are fine with

22  it or have the agent answer two questions about the

23  grandmother, whichever Your Honor would prefer.

24          **MR. MEETZE:**  I don't object to him proffering this

25  information, Judge.

1          **THE COURT:**  Well, she's still under oath. Just let

2    her proffer. That's fine. If something comes up, I'll listen to

3    anything.

4          **MR. MEETZE:**  Okay.

5          **MR. DANIELS:**  Your Honor, if the agent were to

6    testify, she would testify that --

7          **THE COURT:**  Well, she is right --

8          **MR. DANIELS:**  Sure.

9          **THE COURT:**  She can just say it.

10          **MR. DANIELS:**  Sure. Your Honor, Special Agent Norden

11    with the FBI. She'll proffer three pieces of evidence that

12    would have come out if I put her on the stand.

13          **THE COURT:**  Okay.

14          **THE WITNESS:**  Okay.

15          So when we searched the residence and found the

16    drugs, the -- can I take this off?

17          **MR. DANIELS:**  I'm sure you can.

18          **THE WITNESS:**  Can I take this off?

19          When we searched the residence and found the drugs,

20    the grandmother commented that they were legal in Vermont and

21    were okay, seemed to be okay with the drugs in the residence,

22    which were the mushrooms and the marijuana.

23          A few times during the course of the search, the

24    grandma said what she said here that he was a patriot and he

25    was for America, but they didn't want to see any of the photos

1    or the videos or anything that we had of our case. It didn't

2    appear that there was an understanding of anything that had

3    been done wrong by the defendant. And that the -- the drugs --

4    now I lost my train of thought -- and that on the way down from

5    Vermont driving down to South Carolina to move that the

6    defendant was showing the grandmother some of the -- some of

7    the videos and the writings of the QAnon. And when we were, you

8    know, taking the stuff, we were discussing that the George

9    sweatshirt, not just politics as usual, was reference to the

10   JFK Junior magazine that has since gone out of business which

11   is part of the QAnon conspiracy theory that the Kennedys are

12   coming back.

13           We were going through some of the stickers and stuff.

14   So there's nothing wrong with that. There's nothing illegal

15   with that. While there's not, it just seems that the belief in

16   the -- in those conspiracy theories that lead to some of the

17   actions that happened on the 6th were minimized.

18           **THE COURT:**  Okay. All right.

19           **MR. MEETZE:**  Just one minute please, Your Honor.

20           (Pause.)

21           Judge, I don't see any point in just continuing on

22   with this. I think we don't really have any response to that.

23           **THE COURT:**  Okay. All right.

24           I was going to say we need to get her on the stand if

25   we're going to start going back and forth.

1    **MR. MEETZE:**  Right.

2    **THE COURT:**  All right.

3    Anything further?

4    **MR. DANIELS:**  Not from the government, Your Honor.

5    **THE COURT:**  Mr. Meetze?

6    **MR. MEETZE:**  No other witnesses, judge.

7    **THE COURT:**  No other evidence from either side?

8    All right.

9    Any argument as to probable cause, Mr. Meetze?

10   **MR. MEETZE:**  I have got one argument, Judge.

11   **THE COURT:**  Okay.

12   **MR. MEETZE:**  And that is as to the charge, violation

13   of -- I've got the wrong thing here. I think it's 18-641. For

14   that offense to be a felony, the property of the government in

15   question has to be worth more than a thousand dollars. There's

16   been no evidence presented that that shield that he's accused

17   of taking is worth more than a thousand dollars. So in that

18   case, I think there's no probable cause that the felony offense

19   has been committed, only a misdemeanor offense, and we ask that

20   the felony portion of that charge be dismissed.

21   **THE COURT:**  Is it charged as a felony in the

22   complaint?

23   **MR. DANIELS:**  Yes, it is, Your Honor. And in the

24   complaint, there is evidence on the record before the D.C.

25   Judge that the value of the shield is more than $1000. I'll

1    pull up that statement of facts now. (Pause.)

2         Your Honor, looking at the statement of facts between

3    Pages 5 and 6 of the complaint, where the affiant submits that

4    police shields or things of value of the United States or any

5    department or agency thereof -- let me look for the

6    thousand-dollar reference if that's something that Your Honor

7    has a question on. (Pause.)

8         That same language is on Page 83 of the search

9    warrant affidavit.

10        **THE COURT:**  Page --

11        **MR. DANIELS:**  I'm sorry. Paragraph 83 of the  search

12   warrant affidavit at Page 27, Your Honor. And I do know that

13   FBI has consulted with the U.S. Capitol Police and determined

14   that those riot shields he was in possession of were valued at

15   more than $1000. That's something that Your Honor would take

16   under advisement on that preliminary hearing question. I can

17   certainly get that to you in a sworn statement, if that's

18   something that Your Honor would like to consider.

19        **THE COURT:**  I don't have a copy of a search warrant.

20   It's not part of the record. Is your agent prepared to testify

21   to that?

22        **MR. DANIELS:**  Yes, she is, Your Honor. Yes. She is

23   able to offer that statement on the record for you.

24        **THE COURT:**  All right.

25        Mr. Meetze, you -- any objection to her testifying to

Patricia Norden - Redirect Examination by Mr. Daniels                          120

1   what she previously testified in the affidavit submitted to the

2   Court?

3             **MR. MEETZE:**  No objection.

4             **THE COURT:**  All right.

5             Again, I will remind you you're still under oath.

6             **MR. DANIELS:**  Your Honor, I offer Special Agent

7   Norden who will proffer facts as to the value of --

8             **THE COURT:**  This isn't proffer. I'll let you testify,

9   if you want to, as to --

10            **MR. DANIELS:**  Thank you, Your Honor.

11                         **PATRICIA NORDEN**

12       having previously been duly sworn, testified as follows:

13                       **REDIRECT EXAMINATION**

14   **BY MR. DANIELS:**

15   **Q**   Special Agent Norden, can you please tell the Court what

16   you know about the value of the police shields based on

17   consultations between the FBI, U.S. Attorneys Office and the

18   U.S. Capitol Police?

19   **A**   I was advised by the U.S. Attorneys Office down in

20   Washington, D.C., in drafting this complaint and other

21   complaints that have been filed for subjects that have been

22   taking the riot shields that they are worth more than a

23   thousand dollars which is why they have been going for that

24   charge.

25            **THE COURT:**  Okay.

Ruling of the Court                                                    121

1          Mr. Meetze, do you want to question her on that at

2   all?

3          **MR. MEETZE:**  How much are they worth, Judge,

4   specifically?

5          **THE COURT:**  She testified they are worth more than

6   $1000.

7          **MR. MEETZE:**  Did they tell her exactly how much

8   they're worth?

9          **THE COURT:**  Ask her.

10         **THE WITNESS:**  Not exactly how much they are worth,

11  but that they do meet the threshold for that charge.

12         **MR. MEETZE:**  No further questions.

13         **THE COURT:** Okay. All right.

14         Thank you, ma'am.

15         Okay.

16         With that said, any other arguments as to probable

17  cause?

18         **MR. MEETZE:**  No, Your Honor.

19         **THE COURT:**  Okay.

20         I do find that based on the testimony presented today

21  that the government has their -- has met the burden to show

22  probable cause as to violation of 18 U.S.C. 111(a)(1) and (b);

23  18 U.S.C. 231(a)(3) and Section 2, aiding and abetting;

24  18 U.S.C. 641 and 2; 18 U.S.C. 1752(a)(1), (2) and (4) and

25  (b)(1)(A); as well as 40 U.S.C. Section 5104(e)(2)(D) and (G).

Argument of Counsel

1   All right.

2          As to the matter of bond, I will be glad to hear.

3   It's the government's burden.

4          **MR. DANIELS:**  Thank you, Your Honor.

5          Your Honor, based on the testimony and the evidence

6   in the record today, there is no condition or combination of

7   conditions that can protect the public from the defendant in

8   this case. The nature and circumstances of the offense itself

9   weighs strongly in the favor of detention. The defendant may

10  like to divorce his conduct from the context in which it was

11  committed. The defendant may like to argue he just threw a cone

12  or he just threw a bear spray at the police, but that's not

13  what he did at all.

14         He participated in a violent mob that attacked the

15  United States Congress and was successful in getting the

16  Speaker of the House, the President pro tem of the Senate, the

17  Vice President of the United States, and members of both

18  chambers of Congress -- the mob that he participated in caused

19  the evacuation of the United States Congress. It also caused

20  the shutting down of the counting electoral votes, the

21  certification for the Presidential election.

22         What he did was not a simple assault. What he did was

23  he attacked our government. He opposed by force the government

24  to impose his view that presumably the election was stolen.

25         Your Honor, he assaulted law enforcement officers. He

Argument of Counsel                                                123

1    is a trained military veteran himself who is discharged after

2    drug use, unfortunately, Your Honor. But as a military veteran,

3    he assaulted law enforcement. He stole a riot shield. He threw

4    bear spray at them. He threw a bear kit object, and he threw a

5    stick like object. He also threw a smaller object that had

6    orange coming out of it as he threw it. When he did that at

7    5:01 p.m., there's no question, Your Honor, that he knew that

8    it was apparent that what was happening was a violent mob.

9            There was no political protest happening. This was

10   hours after the political speeches that ended in a different

11   part of the city. He had marched thousands of years to the

12   Capitol, entered restricted areas and assaulted the cops. He

13   has already shown us, Your Honor, in recent history in the last

14   four months that he is willing to be violent to further his

15   views. And that's the problem we have here, Your Honor, is,

16   yes, there are conspiracies and commitments to QAnon and,

17   apparently, an interest in the Three Percenters and the Proud

18   Boys and even white supremacy. Bad ideas is not a crime. That's

19   not why we are here. That's not why he's a danger to the

20   community. He is a danger because he is willing to use force

21   and willing to use violence to further his views.

22           He has those views. They are prolific throughout his

23   phone. They are prolific throughout his social media. They are

24   prolific throughout his writings. They're in his house. They're

25   on his person. They're in his clothes. It's very apparent where

Argument of Counsel                                            124

1    his commitments are, Your Honor.

2         The weight of the evidence is one factor this Court

3    must consider, and it's overwhelming. He's on video committing

4    the crimes. Two judges have agreed there's probable cause to

5    believe he committed the crimes. He's on video. There are

6    photos of him committing the crimes.

7         As you know, many federal cases enter this courthouse

8    that's not video-recorded of them committing their crimes.

9    There are photos of him committing the crimes. There are

10   selfies of him at the crime scene up above the West Terrace

11   just below the Lower West Terrace. Your Honor, the weight of

12   the evidence is strong. There are multiple witnesses who

13   identified him in photos who submitted tips to the FBI and said

14   yes, that is him.

15        Your Honor, another factor this Court must consider

16   is the length of imprisonment that he may face if convicted. He

17   is subject to a lengthy term of imprisonment. One of the crimes

18   carries up to 20 years in federal prison, another carries up to

19   10, two up to five, and one up to one. Your Honor, that is

20   serious time in federal prison. He is subject to a lengthy

21   period of incarceration if convicted.

22        The criminal history, Your Honor, is another factor

23   that this Court must consider. While yes, he does not have a

24   conviction history, what is clear is that he is a recidivist

25   and a repeat returner to law enforcement across the country.

1   We're talking about the U.S. Capitol Police in D.C., the

2   Vermont State Police, the Burlington Police Department, the

3   Morristown Police Department, the County Sheriff's office, and

4   now the FBI has to go to his home where he moved in the last

5   number of weeks here in South Carolina.

6           In the last four years, Your Honor, what the evidence

7   has shown across these incident reports is a serious downward

8   spiral. Although in the earliest incident report we have would

9   be the 2018 discharge from the military for drug use and a 2019

10  protective order, the 2019 protective order where the victim

11  offered a sworn statement to three Judges that found it

12  credible says since 2016, that's going back five years now, he

13  has threatened this victim. And in that petition we saw, he

14  threatened to kill himself, he threatened to kill his victim,

15  he threatened to kill his victim's associates, he threatened to

16  put a bullet in the victim's head if the victim went to a party

17  that he didn't want the victim to, he also said, "I am in your

18  town." It's much like what he said in the pizza shop, "I know

19  who you are. I know where you are." If that's not threatening

20  in this context, Your Honor, I don't know what is.

21          The protective order, Your Honor, shows that January

22  is not just a one-off event, just like his phone shows "I'm

23  just getting in the fight" that came after the riots, after

24  five people died in the Capitol, shows it's not over for him.

25  It's not. It started five years ago. It continued at the

1  Capitol. It continues today.

2          That protective order shows someone was in fear for

3  their life for him, someone who knew him. And the three Judges

4  in Vermont signed off on an order to keep him away from that

5  victim for a year, to prohibit him from firearm possession, and

6  there were factual findings of that, Your Honor, that had

7  already been resolved by another court of competent

8  jurisdiction in Vermont that said he stalked his victim, he

9  threatened his victim, he threatened serious harm, and he must

10  be restrained from doing so further.

11          Your Honor, from 2019 to 2021, we had Facebook chats

12  showing drug distribution according to the Morristown Police

13  Department. The Morristown Police Department initiated a

14  traffic stop where he said, "Eff you, cops. I don't care who

15  you are. Effing 'c' words, I hate the cops." The Vermont State

16  Police had to respond to an assault where he said he, quote,

17  pounded someone who brandished, left them in the cold without

18  clothes in the winter.

19          In April 2019, Your Honor heard evidence of the

20  Lamoille County Sheriff's Office where there was a call for

21  service where the defendant was out of control pushing people,

22  breaking things.

23          Your Honor also heard evidence that in May 2020,

24  there was an encounter where the sheriff's office had to

25  respond because two minor boys called because the defendant

1  brandished a firearm. He said, "I didn't brandish it. I just

2  held it up in the air." But he did admit to racking it, that

3  is, putting around in the chamber. If that's not reckless,

4  Your Honor, we're lucky that nothing further happened that day.

5       That day, Your Honor, he indicated he was emerging

6  from the woods after engaging in satanic rituals. Those boys,

7  17-year-old and 16-year-old, who were looking for a campfire

8  site, told the sheriff's office that he pointed a gun at them.

9  That's consistent with what he did to his victim and,

10  apparently, Your Honor, his commitment to be willing to

11  intimidate and use harassment, threats, and force was apparent

12  there as well with his minor boy victims.

13       Then starts the spiral, Your Honor, of the pedophile

14  symbols and the pizza shops that were fronts for child sex

15  trafficking, which I don't need to go into the veracity of

16  anything like that, but it's classic commitment to QAnon

17  conspiracies, Your Honor, which is also a conspiracy that --

18  that does not have a high view of the authority of this

19  government on which this federal court sits.

20       Your Honor, and so we start for a period of the year

21  where there's five different either businesses or people who

22  had to call the police and said, "I've received e-mails. I've

23  received phone calls. I've received social media contact.

24  There's harassment. There's threats. I'm worried for my

25  employees." And what he is saying is that there are children

1  being sold for sex in the basement of pizza shops and the

2  downtown civic area is a secret symbol for pedophilia. And the

3  instability that was caused by all of those -- with all of

4  those victim reports were clear, causing law enforcement

5  responses on each.

6          Your Honor, the search of the Vermont residence

7  reveal as the agent testified, evidence of somebody who had

8  engaged in tactical training. There was fighting. There was a

9  punching bag. There was a car that was shot up. There was

10  targets. There was something called a target list. Underneath

11  the target list were three categories: breach, attack, and

12  assault. There's been no explanation from the defendant as to

13  what that might mean. I'm sure that's something that -- at a

14  minimum, it's something the government would like to know.

15          In addition to the target list, there was the object

16  Washington that had times and beside the times. It had breach,

17  it had hold, it had weight, it had road. If that doesn't look

18  like a tactical plan, Your Honor, I don't know what does.

19          The search of the South Carolina residence showed

20  further evidence that causes concern for the safety of the

21  public, and those were the AR-15 that was in the pillow with

22  him with the 16-round extended magazine and one in the chamber.

23  Particularly for someone who says, "Hey, fed boy. There's all

24  sorts on the other side of the doors," while he's holding a

25  shotgun. That's a risk, Your Honor, for agents.

1          If agents had to go out again to see the defendant

2    who post that, who tells us what his view is -- see, we take

3    people at their word. When they post things, which is a picture

4    of them holding a gun that says, "Hey, fed boy. There's all

5    sorts of things on the other side of the doors," if that's not

6    a threat, Your Honor, to the agency who may have to go out and

7    see him again, I don't know what is. So there was the AR-15

8    with 60 rounds and one in the chamber, there was a hunting

9    rifle and there's a shotgun associated with him.

10         There were also drugs. Although he told this Court

11   through the pretrial services interview that he does not really

12   have a drug problem and it's only marijuana, the evidence

13   Your Honor's heard shows otherwise. There's years-long record

14   of drug use where the petitioner for the protective order said,

15   "He is fueled by drugs and he has been threatening me since

16   2016" --  that was in 2019 -- where he was removed from the

17   military in 2018 for cocaine use, where today, last week when

18   he was arrested, there were both mushrooms and marijuana in his

19   apartment -- his residence, something that did not seem to be

20   taken seriously by, at least, the defendant, I'll say. What

21   that shows is a pattern of drug use, Your Honor, that creates

22   instability that makes him an unsuitable candidate for bond.

23         Your Honor, in the residence in South Carolina, if

24   you could pull up Government Exhibit No. 17, I believe,

25   Your Honor, there is a -- the evidence that is on his phone is

1    deeply concerning, Your Honor. It shows us the seriousness that

2    he takes the charges that are pending before the Court. In that

3    first picture, he said, "I'm okay with attacking a government

4    building to stop you as long as you fraudulently certify an

5    election to win."

6          Your Honor, he said on April 9, that is what we're

7    looking at, about two weeks ago on the bottom right photo, "The

8    FBI should really find a better hobby then intimidating and

9    persecuting patriots." That's what he sees the criminal case

10   as, as not a legitimate criminal case, but one that the FBI is

11   intimidating and persecuting patriots.

12         On the bottom left, he says, "Dear FBI, you shoot my

13   dog, I shoot you." It's consistent with his pattern of telling

14   the police if you do something with my dog, if you don't act

15   nice, I'll shoot you." On the top right, he doesn't doubt

16   seriously the charges will stick.

17         On the second page, Your Honor, is evidence of what

18   he thinks of federal agents apparently. "Life has many doors,

19   fed boy." On the bottom of the second page, he says all he sees

20   his 17 signs. "I see 17 tribunals in my mind," which is a

21   common conspiracy that members of the government will be tried

22   for treason. "Hang them high. Hang them effing high."

23         On the left, this is what he says: "You have been

24   trained and prepared for this movement. The individuals who are

25   involved in the 17 communities are trained sleeper agents.

Argument of Counsel                                                                                     131

1    Though we" –– he puts himself in that group –– "though we

2    haven't been very active since the beginning of the operation.

3    We have not been activated yet. You are about to be activated,

4    lock and load. This is not a game. This is a great awakening.

5    Nothing can stop that which is coming," Your Honor.

6           It goes on, "Many people are going to jail. A lot."

7    "One, two, three, zero, boom boom boom" is a constant refrain

8    that he has. "To all of my friends, I'm far from out of the

9    fight." That came on January 13, again, after five people died.

10   The photos of the guns.

11          He says he has a crippling drug addiction in 2018.

12   The photos of the evidence of violence to include the brass

13   knuckles which his petitioner had to complain about. There's

14   evidence of suicidality. He's not just a risk to the public,

15   but to himself where he says, apparently in February, "What if

16   I just shot myself on the head?" It's consistent with the

17   petitioner of Vermont saying he's certain to end his own life.

18          Your Honor, the next page, Page 5, this is the

19   defendant in a Guy Fawkes mask. Guy Fawkes literally blew up

20   parliament. That's what he's known for. One of the incident

21   reports that's before Your Honor that's been admitted as

22   evidence had a business saying there's a man running around in

23   a Guy Fawkes mask downtown engaging in the conduct that you

24   already heard about. This is Guy Fawkes. This is the photos

25   that he finds –– that I'll say is on his device, Your Honor.

1        There's QAnon, Three Percenter, and Proud Boys

2    commitments or interests at a minimum. The Q commitment is

3    clear. It's throughout all of his materials.

4        And then finally, on the last page, evidence of an

5    interest, at least, in, I would say, gathering information on

6    white supremacy, (Indiscernible), the future of our white folk,

7    Your Honor. And again, I go back to the defendant is not

8    punished for having views anyone disagrees with, but the

9    problem we have here is that he is willing to be violent to

10   enforce his views. He's shown us that he's willing to oppose by

11   force the government, the US Congress. He told us -- the

12   evidence shows that it began a long time ago. And he has told

13   us on his phone that he's just starting in the fight. He's

14   called himself "we, sleeper agents, we're about to be

15   activated." Your Honor, he has these views. He is willing to be

16   violent. And Your Honor, that is a history despite without

17   having a criminal conviction history of engagement with law

18   enforcement and engagement of criminal activity that should be

19   concerning to anybody, Your Honor.

20       The history of violence and use of weapons is another

21   factor that we've already covered, Your Honor, to include

22   brandishing firearms at victim -- at minors, at his victim who

23   he had to get protection from, telling the victim, "I'm going

24   to put a bullet in your head."

25       The history of alcohol and substance abuse is another

1  factor. We've already covered that evidence as well. In his

2  phone, he called himself having a crippling drug addiction. The

3  victim said he was fueled by drugs. The Army removed him for

4  cocaine. And the drugs were removed from his house here.

5          The employment and the residence, Your Honor, the

6  government does acknowledge and recognize both the grandmother

7  and employers. I'm sure that there's -- I have no beef with

8  them, Your Honor, but he's been here for a matter of weeks.

9  That's not stability. That's not deep roots. He's been here for

10  one quarter, Your Honor. We're in April and he moved here after

11  the riots in January.

12          Your Honor, those are not significant ties to this

13  district. There's evidence he's lived in numerous states. He's

14  lived in different houses. He's been willing to get in cars

15  with people and go to riots in a different state. Your Honor,

16  him having been here for weeks and having a job despite the

17  great merit of his employer, that's not a significant long-term

18  connection that would give the government any confidence he'd

19  be a good candidate for bond.

20          Finally, Your Honor, a factor is this prior failure

21  to appeal. We've already covered that. The Judges wrote in

22  Vermont that despite service, he failed to appear and they had

23  to proceed without him there. He's been here for weeks. He's

24  now facing up to 20 years in federal prison. I know you know

25  how the guidelines work. It doesn't mean he's going to get 20

1  years in prison, but with this risk, that will only increase

2  the risk that he would not attend trial, Your Honor.

3          Your Honor, given his threats to kill himself, kill

4  other people, kill associates, his willingness to use violence

5  to oppose his views, his deep commitments, that we've already

6  covered, his history of drug use, history of crippling drug

7  addiction in his words, the great spiral of instability he's

8  shown in recent years and his conduct in January, Your Honor,

9  the government has no confidence that he would be a suitable

10 candidate for bond. We don't think there is a condition that

11 could protect the public. We also think he's a flight risk,

12 Your Honor. For other factors covered and for those reasons,

13 respectfully, we would ask for Your Honor to order detention.

14         **THE COURT:**  Okay.

15         Thank you, Mr. Daniels.

16         Mr. Meetze?

17         **MR. MEETZE:**  Thank you, Your Honor.

18         Judge, the fact remains that Nicholas Languerand does

19 not have a significant criminal history at all. Despite what

20 may have been written in the incident report, one would think

21 that if all this occurred just as it's listed in the reports,

22 that there would have been some charges somewhere, and there

23 aren't any. There's no evidence -- even if there was a

24 restraining order, we don't know why he wasn't in court. He

25 could've had a -- I don't know why he wasn't in court. But

1    there's no evidence that he violated the terms of that even if

2    there was -- even if there was one, there's no evidence that he

3    violated the terms of it.

4            As to the incident with the pointing of the gun at

5    the -- at the juveniles, an officer was on the scene. He didn't

6    charge him with anything. And Mr. Languerand -- what is in the

7    report there is that he apologized. He said he regretted that

8    that happened that way, that it was a misunderstanding,

9    essentially, is what that was.

10           Judge, it's not illegal for him to possess firearms.

11   It's just not. And the evidence presented here today, the

12   extent of the evidence against this man is that his activity at

13   the Capitol began at 5 o'clock. Congress had already been shut

14   down or temporarily suspended by actions of other people.

15   There's no evidence he's part of a group doing anything

16   tactical like they'd have you believe. Their evidence is he

17   threw some objects, logged some objects over to police shield.

18   There's no evidence that anything that he did actually injured

19   anybody.

20           And then, when he left at the video, Congress didn't

21   resume until much later. There's no evidence he put his hands

22   on any police officer. There's no evidence he entered the

23   Capitol Building. Their evidence is he threw some objects at

24   the police, he picked up a shield that somebody else had taken

25   from a member of law enforcement and he held the shield up. He

1  might have tapped it on the -- banged it on the ground some,

2  but largely if you look at the whole -- if you look at the

3  video, he -- he's getting sprayed with mace too. He's using it

4  not as a weapon, he's more or less to defend himself. Then he

5  walked off with it, which may be -- may not -- may constitute

6  something.

7          But my point here is, Judge, he's not the person

8  that's banging trying to hit the police with a pole, a big

9  flagpole. He doesn't have an aluminum baseball bat pounding on

10  the shield right there in front of the officers. There's

11  just -- I know a lot of bad things happened that day, but

12  there's no evidence that this defendant hurt anybody.

13          He has been living here since January with his

14  grandmother. Doesn't give her any problems. He's got a good

15  job. He's important to his boss. He performs a -- a -- he does

16  a lot for the company. Whether or not he mentioned it or not, I

17  think he did convey that, you know, Nick is one of his more

18  important employees. He's reliable.

19          Judge, there's been testimony about his drug use.

20  People that use drugs or have a problem with drugs, they don't

21  need to be in prison; they need to be somewhere where they can

22  have some drug counseling or some treatment, putting somebody

23  in jail is not a solution to that. We respectfully submit to

24  Your Honor that there are sufficient conditions you could place

25  on him, such as electronic monitoring, house arrest, allowing

1    him go to work that would adequately protect the public. The

2    government's confiscated the guns that he had. He's going to

3    have to forfeit his passport.

4            His grandparents can get him -- help him get back and

5    forth to court. All he has been doing since he's been living

6    with them, Judge, is they've been driving him to work back and

7    forth. He's at the house or he's at work. That's what he's been

8    doing. And -- and we just submit to you that he is a candidate

9    for bond and that you can put sufficient conditions on a bond

10   that would adequately protect the public and assure his

11   appearance in court. Thank you.

12           **THE COURT:**  Okay.

13           Thank you, Mr. Meetze.

14           Yeah. A lot of exhibits were introduced today, and

15   I've looked at them but I'd like to go back through them before

16   I make a decision. I think what I'm going to do, I'm going to

17   take it under advisement and, you know, if I think that bond is

18   appropriate, we're just going to have to reconvene for a short

19   period of time. But I just need to think about it a little bit

20   more before I make a decision.

21           **MR. MEETZE:**  Thank you, Your Honor.

22           **THE COURT:**  Okay.

23           All right.

24           **MR. DANIELS:**  Your Honor, one thing that we heard

25   from defense counsel that the guns were confiscated. They

Argument of Counsel                                                         138

1   actually are still at the house. They weren't on any

2   attachment. He wasn't prohibited at the time. He's now

3   prohibited that he is a -- under felony indict -- well, he's

4   actually not under felony indictment. He's under felony

5   information -- complaint, rather.

6          **THE COURT:**  Right.

7          **MR. DANIELS:**  To the extent that matters, Your Honor,

8   the firearms are still at the house.

9          **THE COURT:**  Okay. Okay. Very good.

10         I'll ---

11         **MR. MEETZE:**  Thank you, Your Honor.

12         **THE COURT:**  --- let y'all know.

13         Mr. ---

14         **MR. DANIELS:**  Judge, thank you very much for your

15  time.

16         **THE COURT:**  --- Languerand, do you understand I'm

17  going to take it under advisement and consider what I think's

18  appropriate to do, and I'll let you -- let you --

19         **THE DEFENDANT:**  Thank you, Your Honor.

20         **THE COURT:**  All right.

21         Thank you.

22      (The Court adjourns at 6:51 p.m.)

23

24

25

1

2                                    *********

3                          C E R T I F I C A T E

4          I, Teresa B. Johnson, Official Reporter for the U.S.

5    District Court, District of South Carolina, hereby certify that

6    the foregoing is a true and correct transcript of the

7    electronically-recorded above proceedings, to the best of my

8    ability.

9

10   _____          August 4, 2021

11   Teresa B. Johnson, CVR-M-CM, RVR, RVR-M            Date

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# I N D E X

**DESCRIPTION**                                                    **PAGE NO.**

Witnesses for the Government:

Patricia Norden

     Direct Examination by Mr. Daniels                      6

     Cross-Examination by Mr. Meetze                       79

     Redirect Examination by Mr. Daniels                   96

     Recross Examination by Mr. Meetze                     98

     Redirect Examination by Mr. Daniels                  120

Ruling of the Court                                              121

Argument of Counsel                                             122

**E X H I B I T S**

| NO. | ID | EV |
|-----|----|----|
| **GOVERNMENT** | | |
| No. 1 | | 6 |
| No. 2 | | 6 |
| No. 3 | | 6 |
| No. 4 | | 6 |
| No. 5 | | 6 |
| No. 6 | | 6 |
| No. 7 | | 6 |
| No. 8 | | 6 |
| No. 9 | | 6 |
| No. 10 | | 6 |
| No. 11 | | 6 |
| No. 12 | | 50 |
| No. 13 | | 6 |
| No. 14 | | 6 |
| No. 15 | | 6 |
| No. 16 | | 6 |
| No. 17 | | 6 |
| No. 18 | | 6 |

# <u>E X H I B I T S</u>

<u>NO</u>.                                                    <u>ID</u>    <u>EV</u>

### DEFENSE

No exhibits offered.

### COURT

No exhibits offered.